UNITED STATE DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DOROTHY GUINAN, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 05-10805DPW |
| ) | |
| BOSTON COLLEGE, JAMES P. ) | |
| MCINTYRE, and TRACEY LAPAN, ) | |
| Defendants. ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I. Procedural History

Plaintiff Dorothy Guinan filed her complaint in this court on April 22, 2005.  In the complaint, Ms. Guinan alleged that she had been wrongfully discharged from her employment at Boston College, and this discharge was based upon age and sex discrimination against her by Defendants Boston College, James McIntyre, a senior vice president at the college, and Tracey Lapan, McIntyre's administrative assistant.  The plaintiff alleges that the defendants, in discriminating against her, violated the Age Discrimination in Employment Act of 1967 ("ADEA"), Title VII of the Civil Rights Act of 1964, and M.G.L. c. 151B.

Originally, Ms. Guinan had filed a complaint on February 9, 2001 with the Massachusetts Commission Against Discrimination (MCAD).  In that complaint, she alleged that her termination from employment at Boston College (BC) on August 29, 2000 was based upon age and sex discrimination by respondents BC, McIntyre and Lapan (the defendants in this case), and that the respondents had violated the three

statutes cited above.  On March 24, 2004, the MCAD found a lack of probable cause, ruling that Ms. Guinan had failed to introduce sufficient evidence to show that an unlawful act of discrimination had occurred.  This decision was affirmed on appeal on June 30, 2004 by an MCAD Commissioner, and the complaint was dismissed.  (See attached Ex. 1).

When Ms. Guinan filed her complaint with the MCAD, notice of the filing and a copy of the complaint were also sent to the Equal Employment Opportunity Commission (EEOC) by the MCAD.  On February 2, 2005, the EEOC notified Ms. Guinan that it had adopted the MCAD's findings, and further notified her that she had ninety (90) days from her receipt of the notice to file a lawsuit alleging violations under federal law.  (See attached Ex. 2).

Ms. Guinan also filed a complaint in Middlesex Superior Court on July 29, 2004, again alleging age and sex discrimination by Defendants BC, McIntyre, and Lapan leading to her wrongful discharge.  The defendants moved for summary judgment, contending that the statute of limitations established by M.G.L. c. 151B (3 years from the date of the discriminatory act) had run by the time this complaint was filed.  This motion was allowed by the court on June 10, 2005, and judgment was entered for the three defendants.  (See attached Ex. 3).

## II. Statement of Material Facts

In accordance with Local Rule 56.1, Defendants Boston College, James P. McIntyre, and Tracey Lapan submit the following statement of material facts of record as to which these defendants contend there is no genuine issue to be tried:

1.    In December, 1999, Plaintiff Dorothy Guinan went to an "open house" regarding employment opportunities available at Boston College (Guinan depo. at 13).

2.    Because she was a single parent with a grammar school aged child, Ms. Guinan was seeking a part-time position.  Although nothing was available through the Open House, she was eventually contacted by a Boston College representative concerning a part-time job in the office of Dr. James McIntyre, Senior Vice President at the college (Guinan depo. at 15).

3.    The position available was a "Secretary II Senior Vice President's Office-Level 5" (McDevitt depo. at 12-13)[1].  A description of the position is attached to this memo as Exhibit 4.

4.    Following the completion of the application process and interviews, Ms. Guinan was hired for this part-time position in Dr. McIntyre's office (Guinan depo. at 15).

5.    This position was for 20 hours a week (Guinan depo. at 17), and Ms. Guinan began her work at the college on February 28, 2000 (Guinan depo. at 26).  At the time, she was 49 years old, having been born on June 15, 1950 (Guinan depo. at 5).

6.    Her work hours were 9:00 a.m. to 1:00 p.m., five days a week (Guinan depo. at 26).

7.    Sometime after Ms. Guinan began to work in Dr. McIntyre's office, she asked to change her work hours, with the agreement of her supervisor Tracey Lapan, to 8:30 a.m.-12:30 p.m. in order to accommodate her son's school schedule.  The hours again were changed, at Ms. Guinan's request, back to 9:00 a.m.-1:00 p.m. on or about

---

[1] Please note that defendant Tracey Lapan's married name is Tracey McDevitt.  At the time of the involved events, she was not married, and all pleadings refer to her by her maiden name.  By the time she was deposed, she had married, and cites to the McDevitt deposition refer to Ms. Lapan's deposition testimony.

June 11, 2000 when Ms. Guinan's son got out of school for the summer (Guinan depo. at 26-28).

8.      The staff in Dr. McIntyre's office consisted of Dr. McIntyre, the Senior Vice President; Tracey Lapan, Assistant to the Senior Vice President; a full-time secretary; and Ms. Guinan, working in the slot for a part-time secretary (McDevitt depo. at 16).

9.      Tracey Lapan was Ms. Guinan's supervisor (Guinan depo. at 63-64). Ms. Guinan understood that her duties included transcribing tapes dictated by Dr. McIntyre, filing documents, and answering telephones (Guinan depo. at 37).

10.     From the beginning of Ms. Guinan's employment, Ms. Lapan noticed errors in Ms. Guinan's work (McDevitt depo. at 19-20).

11.     On at least several occasions during Ms. Guinan's first three months on the job, Ms. Lapan had criticized Ms. Guinan for errors in her work. (Guinan depo. at 63). In addition to informing Ms. Guinan of her concern about these problems, Ms. Lapan decided that she would not assign to Ms. Guinan several other responsibilities which were part of Ms. Guinan's job description (see Exhibit 4; McDevitt depo. at 47-48).

12.     Ms. Guinan herself admits that her work was often criticized by Ms. Lapan (Guinan depo. at 60-61), and she acknowledges that there were many discussions and criticisms of her work product (Guinan depo. at 63; also see Guinan answer no. 4 to Boston College interrogatories attached as Exhibit 2).

13.     From some time early in Ms. Guinan's tenure at Dr. McIntyre's office, Dr. McIntyre began to receive regular reports from Ms. Lapan indicating that Ms. Guinan's work was not satisfactory (McIntyre depo. at 10).

14.     Dr. McIntyre also was aware that Ms. Guinan was not always on time for work (McIntyre depo. at 14).

15.     Also during Ms. Guinan's first few months at work, Tracey Lapan had talked to Ms. Guinan about arriving late at the office, and warned Ms. Guinan that she should be at her desk by 9:00 a.m. to answer telephone calls (Guinan depo. at 65).  Ms. Guinan understood that Tracey Lapan told her this because Ms. Lapan or others felt Ms. Guinan was not getting to work on time to answer the phones (Guinan depo. at 45-46).

16.     Sometimes, Ms. Guinan would be significantly late for work (up to one hour) (McDevitt depo. at 30).

17.     In August, 2000, Ms. Lapan met with Ms. Guinan in order to review Ms. Guinan's job performance (McIntyre depo. at 14; McDevitt depo. at 28).

18.     At the meeting, Ms. Lapan informed Ms. Guinan of the various improvements she was expected to make in her work, both in her typing and in her punctuality (McIntyre depo. at 14; McDevitt depo. at 28).

19.     This meeting was followed by a letter, dated August 17, 2000, from Ms. Lapan to Ms. Guinan memorializing the conversation which took place at the earlier meeting and again outlining for Ms. Guinan the criticisms of her work performance and the need for improvement (see McDevitt affidavit with attached letter).  Ms. Guinan herself says that the letter was the culmination of regular discussions regarding criticisms of her work (Guinan depo. at 81-82).

20.    Ms. Guinan was upset and stunned by the letter's criticisms. (Guinan depo. at 82).

21.    Ms. Guinan did not have an opportunity to immediately talk to Ms. Lapan about the letter; instead, Ms. Lapan suggested to her that she think about the letter over the weekend (Guinan depo. at 84).

22.    While working during the week following her receipt of the letter, Ms. Guinan completed typing various tapes and letters for Dr. McIntyre (Guinan depo. at 86).

23.    On Friday, August 25, 2000, Ms. Guinan arrived at work and found that Ms. Lapan had made various corrections on some of the work which Ms. Guinan had typed (Guinan depo. at 86).

24.    After Ms. Lapan arrived at work on August 25, 2000, Ms. Guinan went into Ms. Lapan's office, asking for an explanation of the corrections (McDevitt depo. at 36).

25.    Ms. Lapan tried to explain what the corrections entailed and why they had been made, and repeated to Ms. Guinan that this again was what they had talked about on so many occasions, and was the reason that the August 17 letter had been written (McDevitt depo. at 37-38).  When Ms. Guinan persisted in asking Ms. Lapan to review the materials, Ms. Lapan asked Ms. Guinan to leave her office (Guinan depo. at 94).

26.    As Ms. Guinan left the office, she asked Ms. Lapan "is this the way the Carroll School (the BC graduate business school which Ms. Lapan was attending) teaches how to deal with conflict?"  Ms. Lapan responded that Ms. Guinan was acting unprofessionally, to which Ms. Guinan responded that she always was a professional (Guinan depo. at 102).

27.    Dr. McIntyre had taken August 25 as a vacation day.  Even though he was out of the office, Ms. Lapan was able to reach him by telephone to explain what had happened with Ms. Guinan (McDevitt depo. at 41; McIntyre depo. at 15-16).

28.    Dr. McIntyre felt that Ms. Guinan's behavior was totally inappropriate, unacceptable and insubordinate (McIntyre depo. at 16).

29.    He decided to speak to Leo Sullivan, the college's Vice President for Human Resources, about the situation and about Ms. Guinan's work in his office (McIntyre depo. at 16-17).

30.    The two met over the weekend, and again on Tuesday, August 29 (McIntyre depo. at 18-19).

31.    Dr. McIntyre believed that Ms. Guinan's behavior, which he felt was insulting and confrontational to a supervisor (McIntyre depo. at 12), was unacceptable and he could not have Ms. Guinan working in his office (see McIntyre affidavit and attachments).

32.    Mr. Sullivan gave Dr. McIntyre permission to terminate Ms. Guinan's employment if Dr. McIntyre felt it was appropriate (McIntyre depo. at 19).

33.    Dr. McIntyre then met with Ms. Guinan on August 29, 2001.  At the meeting, Dr. McIntyre told Ms. Guinan that her job performance was unacceptable and that her behavior during the August 25 meeting with Ms. Lapan was inappropriate and insubordinate (see McIntyre affidavit and attachments), resulting in her employment at the college being terminated.

### III. Summary Judgment Standard

In <u>Kearney v. Philip Morris, Inc.</u>, 916 F. Supp. 61, 64 (D. Mass. 1996), summary

judgment was described as follows:

> "The purpose of summary judgment is "to pierce the
> pleadings and to assess the proof in order to see whether
> there is a genuine need for trial." <u>Garside v. Osco Drug,
> Inc.</u>, 895 F. 2d 46, 50 (1st Cir. 1990) (quoting Fed. R. Civ.
> P. 56 advisory committee's note). If the pleadings,
> depositions, answers to interrogatories, admissions and any
> affidavits on file show that there is no genuine issue as to
> material fact, then the moving party is entitled to judgment
> as a matter of law. Fed. R. Civ. P. 56(c).
>
> Where, as here, the moving party does not have the burden
> of proof at trial, that party nevertheless must make a
> showing, by "pointing out to the district court," that the
> evidence is insufficient to support the non-moving party's
> case. <u>Celotex v. Cartrett</u>, 477 U.S. 317, 325, 106 S. Ct.
> 2548, 2554, 91 L. Ed. 2d 265 (1986). Once this showing
> has been made, it is up to the nonmoving party to proffer
> sufficient competent evidence to establish the existence of
> a genuine issue of material fact. <u>United States v. One
> Parcel of Real Property</u>, 960 F. 2d 200, 204 (1st Cr.
> 1992)."

In employment discrimination cases "where elusive concepts such

as motive or intent are at issue," summary judgment is not a favored tool,

but judgment will enter if the non-moving party "rests [her case] merely

upon conclusory allegations, improbable inferences, and unsupported

speculation." <u>Luciana v. Coca-Cola Enterprises, Inc.</u>, 307 F. Supp. 2d

308, 317-18 (D. Mass. 2004) citing <u>Feliciano de la Cruz v. El

Conquistador Resort and Country Club</u>, 218 F. 3d 1, 5 (1st Cir. 2000). To

overcome a summary judgment motion, a plaintiff "must point to specific

facts detailed in affidavits and depositions – that is, names, dates,

incidents, and supporting testimony – giving rise to an inference of discriminatory animus." <u>Luciana</u> at 318 citing <u>Hoeppner v. Crotched Mountain Rehabilitation Center, Inc.</u>, 31 F. 3d 9, 14 (1st Cir. 1994).

## IV. Discussion

The plaintiff's complaint contains three counts, each alleging that the defendants wrongfully discharged her in violation of several statutory provisions barring discrimination based upon age or gender. In a case such as this where the plaintiff must rely upon indirect rather than direct evidence of discrimination, the Supreme Court has established a framework with which the plaintiff must comply in order to prevail against a summary judgment motion. This was set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L.Ed. 2d 668 (1973), and requires that the plaintiff first establish a prima facie case of discrimination. If the plaintiff succeeds, then the defendant must articulate a legitimate, non-discriminatory reason for the action taken, following which the plaintiff has the burden to show that the offered reason was not the true reason for the action, but instead was a pretext for underlying discrimination. <u>Petitti v. Commonwealth of Massachusetts Department of Mental Health</u>, 859 F. Supp. 33, 38 (D. Mass. 1993). For the reasons set forth below, the defendants submit that the plaintiff will be unable to meet this standard. The defendants therefore are entitled to summary judgment on each count.

### Count I: The Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §621 et seq.

#### A. Prima Facie Case

The plaintiff contends that the defendants discriminated against her because of her age, in violation of the ADEA. For the plaintiff to initially establish a prima facie case of

age discrimination, she must prove that she (1) was at least 40 years of age; (2) met her employer's legitimate job performance expectations; (3) experienced an adverse employment action; and (4) was replaced by a younger person with roughly equivalent job qualifications.  <u>Vesprini v. Shaw Industries, Inc.,</u> 221 F. Supp 2d 44, 56 (D. Mass. 2002).

To prove this prima facie case and avoid summary judgment, Ms. Guinan must show, among other things, that she had performed her work in an acceptable way, thus fulfilling her employer's legitimate job performance expectations.  In our case, there is no evidence to support such a finding.  Instead, the evidence overwhelmingly shows that Ms. Guinan did not meet her employer's expectations, and did not perform her job in an acceptable way.  From the start of Ms. Guinan's work in Dr. McIntyre's office, Tracey Lapan, the office supervisor, noticed errors in Ms. Guinan's work (McDevitt depo at 19-20).  Ms. Lapan spoke to Ms. Guinan about these errors, and Ms. Lapan decided that she would not assign several other job responsibilities to Ms. Guinan because she felt Ms. Guinan could not handle them (McDevitt depo. at 47-48).

Ms. Guinan agrees that she received frequent criticism from Ms. Lapan about her work, and that there were numerous discussions about the quality of her work (Guinan depo. at 60-61, 63).  Dr. McIntyre received frequent reports from Ms. Lapan that Ms. Guinan's work was not satisfactory (McIntyre depo. at 10).  Additionally, both Ms. Lapan and Dr. McIntyre noted that Ms. Guinan was frequently late for work (McIntyre depo. at 14; McDevitt depo. at 30).  Ms. Lapan spoke to the plaintiff about this issue (Guinan depo. at 65).

Ms. Lapan met with Ms. Guinan in August, 2000 to specifically review with Ms. Guinan her overall job performance, and to express the need for improvement in various aspects of Ms. Guinan's work (McIntyre depo. at 14; McDevitt depo. at 28). This meeting was followed by a letter from Ms. Lapan to Ms. Guinan (see affidavit of Tracey McDevitt) on August 17, 2000, reiterating the improvements in work performance which Ms. Guinan needed to address. Eight days later, on August 25, 2000, Ms. Guinan found that Ms. Lapan had again made corrections to work which Ms. Guinan had typed for Dr. McIntyre (Guinan depo. at 86). Ms. Guinan went to Ms. Lapan's office to ask for explanations about the corrections (McDevitt depo. at 36). Although Ms. Lapan did not want to continuously discuss this, Ms Guinan persisted, and she was asked by Ms. Lapan to leave the office (Guinan depo. at 94). As Ms. Guinan left she commented on Ms. Lapan's ability to resolve conflicts (Guinan depo. at 102). This event was reported by Ms. Lapan to Dr. McIntyre (McDevitt depo. at 40) who, after due consideration and consultation, decided that Ms. Guinan should be terminated because of her insubordination to her supervisor and her overall poor job performance (See McIntyre affidavit).

The defendants submit that the plaintiff also will be unable to introduce factual evidence to establish the fourth prong needed for a prima facie case, namely that the plaintiff was replaced by a younger person with roughly equivalent job qualifications. The Supreme Court, in discussing this particular factor, has said that "a prima facie case requires evidence adequate to create an inference that an employment decision was based on an illegal discrimination criterion. In the age-discrimination context, such an inference cannot be drawn from the replacement of one worker with another worker

11

insignificantly younger." O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312-313 (1996). In interpreting the phrase "insignificantly younger", the First Circuit has agreed with other circuit courts which have held that an age difference of less than five years is insufficient to support a prima facie case. Williams v. Raytheon Company, 220 F. 3d 16, 20 (1st Cir. 2000). Christine Murphy, Ms. Guinan's predecessor, and Maureen Shea, Ms. Guinan's successor, both are women in their late 40's or early 50's (Ms. Guinan was 49 years old when hired, having been born on June 15, 1950-Guinan depo. at 5), both with high school aged children (McDevitt depo. at 17-18).

There is absolutely no evidence that Ms. Guinan will be able to present which shows that Dr. McIntyre or Tracey Lapan attempted to hire a significantly younger person for her position, either before she had the position or after she was terminated. Her allegations about this are nothing more than unsubstantiated claims without any factual basis. In contrast to this evidence, the plaintiff will not be able to present any factual evidence to show she performed adequately or that a significantly younger person was hired. Absent such evidence, the defendants motion for summary judgment should be allowed. Petitti v. Commonwealth of Massachusetts Department of Mental Health, 859 F. Supp 33, 38-39 (D. Mass. 1993).

### B. Employer's Legitimate Reason for Action

If the court determines that Ms. Guinan has presented a prima facie case, this only creates a presumption that the employer engaged in impermissible discrimination. LeBlanc v. Great American Insurance Co., 6 F. 3d 836, 842 (1st Cir. 1993), cert denied, 511 U.S. 1018. The burden then shifts to the defendants who may rebut the presumption by producing a legitimate, non-discriminatory reason for the employment action. Id. at

842. If the defendants present such a reason, the presumption created by the prima facie

case disappears. Id. at 842.

The defendants in this case have provided legitimate reasons for discharging Ms.

Guinan from her employment. The deposition testimony of defendants Dr. McIntyre and

Tracey McDevitt, together with the letters to Ms. Guinan presented through the affidavits

of McIntyre and McDevitt show that Ms. Guinan failed to perform her job in a

satisfactory manner almost from the time that she began to work at Boston College for

Dr. McIntyre and under the supervision of Tracey Lapan. As Ms. Guinan admits,

criticisms of her typing errors and tardiness were made to her on numerous occasions

(Guinan depo. at 60-61, 65). She was well aware that her employer was not satisfied

with these aspects of her job performance. Even after the numerous talks which she had

with Ms. Lapan and the letter which she received on August 17, 2000 outlining the

dissatisfaction with her job performance, Ms. Guinan continued to make mistakes in her

work. When these mistakes were again criticized by her supervisor, it led to Ms.

Guinan's confrontation with Ms. Lapan. Dr. McIntyre concluded that Ms. Guinan's

behavior towards Ms. Lapan was inappropriate and insubordinate. This and Ms.

Guinan's poor work performance were the legitimate reasons for the termination. See

<u>Vesprini v. Shaw Industries, Inc.</u>, 221 F. Supp. 2d 44, 60 (D. Mass. 2002).

### <u>C. Pretext for Discrimination</u>

Once the defendants have presented a legitimate explanation for the termination,

the burden shifts back to the plaintiff who then must produce sufficient evidence to show

that the reason offered by the defendants is a pretext for legally prohibited discrimination.

<u>Runyon v. Massachusetts Institute of Technology</u>, 871 F. Supp. 1502, 1508 (D. Mass.

1994).  The plaintiff will be unable to do this.  It is clear that Dr. McIntyre and Tracey

Lapan were dissatisfied with the job performance put forth by Dorothy Guinan.  Ms.

Guinan was repeatedly told about the mistakes in her work product, and about her

tardiness at work.  She was finally presented with the August 17, 2000 letter from Tracey

Lapan detailing the defendants' dissatisfaction with Ms. Guinan's work performance, and

she was asked to make an effort to rectify her problems prior to a review within 30 days

(McDevitt affidavit).

     Ms. Guinan's reaction to this criticism was to confront her supervisor.  Based

upon this incident, Dr. McIntyre determined that he could not continue to employ Ms.

Guinan in his small office and, with the approval of the college's Vice President of

Human Resources, Dr. McIntyre terminated Ms. Guinan.  This was a legitimate, business

related decision based upon the attitude and job performance of Ms. Guinan.  See

Williams v. Raytheon Co., 220 F. 3d 16, 19 (1st Cir. 2000).  There is absolutely no

evidence of any discriminatory intent involved in the termination, and any allegations by

Ms. Guinan to the contrary cannot be substantiated.  If an employee's job performance is

unsatisfactory and/or an employee fails to show proper respect towards a supervisor, then

an employer is entitled to dismiss that employee.  In fact, an employer must dismiss the

employee in order to maintain the proper attitude and morale among the remaining

employees.  The defendants were well within their rights to take the actions which they

took against Ms. Guinan, and her claim of discrimination must be dismissed because it is

unsubstantiated, unsupportable, and lacking in any factual basis.

     Ms. Guinan may contend that comments attributable to Dr. McIntyre or to Ms.

Lapan constitute sufficient credible evidence of discrimination against her by the

defendants, and that evidence of such comments prove that the defendants' reason for dismissing Ms. Guinan was a pretext. Ms. Guinan says that soon after she began working at BC, Ms. Lapan told her that Dr. McIntyre would have preferred to have hired a male or a clone of Tracey for the job (Guinan depo. at 48-49); this was allegedly said in relation to Ms. Guinan arriving late for work because of an issue with her son (Guinan depo. at 51). Ms. Guinan also claims that Ms. Lapan used the phrase "mother's hours" in relation to Ms. Guinan's job (Guinan depo. at 54), and that Dr. McIntyre used the phrases "not a good fit" and "generational differences" (Guinan depo. at 116) when terminating Ms. Guinan. It has generally been held that "stray, workplace remarks . . . normally are insufficient, standing alone, to establish either a pretext or the requisite discriminatory animus." Gonzalez v. El Dia, Inc., 304 F. 3d 63, 69 (1st Cir. 2002). The statements and phrases referenced by Ms. Guinan were used at most on one occasion, and were "brief, stray remarks unrelated to the termination decisional process", and not sufficient evidence to establish discrimination. Wallace v. OC Tanner Recognition Co., 299 F. 3d 96, 100 (1st Cir. 2002). In particular, there is no evidence that a male or substantially younger woman was ever hired for this position. Given the strong evidence that Ms. Guinan was discharged because of her poor job performance and her confrontational meeting with her supervisor, these stray remarks are not sufficient to show that the reason given for Ms. Guinan's termination was a pretext for discrimination. Williams v. Raytheon Co., 220 F. 3d 16, 20 (1st Cir. 2000).

     During discovery in this case, Ms. Guinan has contended that Ms. Lapan was a difficult supervisor who tried to control all aspects of the work in Dr. McIntyre's office (Guinan depo. at 119-120). In fact, Ms. Guinan acknowledged that there was no "age

problem" with this woman (Ms. Lapan), but rather a control issue (Guinan depo. at 119-120). However, this certainly is not sufficient to show discrimination. The ADEA "does not grant relief to a plaintiff who has been discharged unfairly, even by he most irrational managers, unless the facts and circumstances indicate that discriminatory animus was the reason for the decision." <u>Smith v. Stratus Computers, Inc.</u>, 40 F. 3d 11, 16 (1st Cir. 1994).

## Count II:  Discrimination Based Upon Sex: Title VII of the Civil Rights Act of 1964

The <u>McDonnell Douglas</u> analysis, 411 U. S. 792, 802 (1973) is also applied to a sex discrimination case alleging a violation of Title VII. One of the prongs which Ms. Guinan must establish again is that she performed her job in a satisfactory way, meeting her employer's expectations. <u>Williams v. Raytheon Co.</u>, 220 F. 3d at 19 (1st Cir. 2000). Here again, it is the defendants' position that Ms. Guinan did not perform her job in an acceptable manner, as is shown by the overwhelming evidence. The defendants refer the court to the argument presented above with respect to Count I of the complaint. Should the court determine that a prima facie case of sex discrimination has been presented, the defendants also rely upon the arguments presented for Count I regarding the legitimate reason for Ms. Guinan's termination, and the plaintiff's inability to show that this reason was a pretext for discrimination.

Additionally, as noted with respect to Count I, Ms. Guinan's predecessor and successor in the part-time secretarial position were both women, and there is no evidence which the plaintiff will be able to present to show that gender played any role in the defendants' job decision. <u>Williams v. Raytheon Co.</u>, 220 F. 3d 16, 20 (1st Cir. 2000).

## Count III:  Discrimination Based Upon Age and Sex: M.G.L. c. 151B

In this count, the plaintiff contends that the defendants violated M.G.L. c. 151B ("Unlawful Discrimination Because of Race, Color, Religious Creed, National Origin, Ancestry, or Sex") by discriminating against her based upon gender and age.  This statute specifies in §9 that all claims pursuant to the statute must be filed within three (3) years of the alleged discriminatory act.  Davis v. Lucent Technologies, Inc., 251 F. 3d 227-235 (1st Cir. 2001).  The alleged act in our case occurred on August 29, 2000 when Ms. Guinan was discharged from her employment.  Her complaint in this court was filed on April 22, 2005, almost five (5) years after the discharge.  Consequently, her claim in this court is barred by the statute of limitations.  Swaida v. Gentiva Health Services, 238 F. Supp. 2d 325, 328 (D. Mass. 2002).

In addition, the court should note that Ms. Guinan filed a complaint against defendants Boston College, McIntyre and Lapan in Middlesex Superior Court on July 29, 2004 (See Exhibit 3).  In that complaint, she also alleged that the defendants had discriminated against her based upon her sex and age.  The defendants moved for summary judgment, contending that the statute of limitations had expired.  This motion was allowed, and judgment for the defendants was entered.  Given this judgment for the defendants, who are the same defendants before this court facing the same issues in plaintiff's Count III that were presented in the Superior Court complaint, the doctrine of res judicata precludes the plaintiff from proceeding with this course of action.  See Swaida v. Gentiva Health Services, 238 F. Supp. at 327-328 (D. Mass. 2002).

## V. Conclusion

For the reasons set forth above, defendants Boston College, James P. McIntyre and Tracey Lapan submit that plaintiff Dorothy Guinan will be unable to present sufficient evidence to carry her burden of proof on any of the counts in her complaint. Therefore, the defendants' motion for summary judgment should be allowed and judgment should be entered for these defendants.

By their attorney

John B. Johnson
Corrigan, Johnson & Tutor, P.A.
141 Tremont Street
Boston, MA 02111
(617) 338-0075
BBO No. 252580

# EXHIBIT 1

# MEMORANDUM

TO: File
FR: Katherine M. Martin, Esq., Supervisor
CASE: Guinan v. Boston College et al
MCAD NO: 01130438
EEOC NO: 16CA10994
EMPLOYEES: 25+

## RECOMMENDATION FOR DISMISSAL OF THE COMPLAINT

### ISSUES INVESTIGATED:

On February 13, 2001 the Complainant filed a complaint with this Commission alleging that she had been discriminated against because of her age, 50 (DOB 6/15/50) and her sex, female, in that she was subjected to unequal terms and conditions of employment and in that she was terminated in violation of Massachusetts General Laws, Chapter 151B, Section 4, Paragraphs 1, 1b, Title VII of the 1964 Civil Rights Act as amended and the ADEA of 1967 as amended.

The Complainant alleges that she was harassed by Dr. McIntyre's assistant, Tracy Lapan, over "unexpected absences" related to Complainant's son's illness, reprimanded for being 5-10 minutes late because of childcare issues previously approved at the time of her hire, berated for small grammatical mistakes and then terminated in violation of the Respondent's protocol by Dr. McIntyre based solely on Lapan's misrepresentations of her performance and an altercation in which Complainant was accused of being insubordinate..

### SUMMARY OF FINDINGS:

The Complainant cannot establish a prima facie complaint for discrimination based on sex or age. The Complainant is a member of two protected classes. The Complainant was not meeting the reasonable expectations of her employer in that she was unable or unwilling to conform to the standards of the office including proofreading her work and being punctual for work. The Complainant was cited for tardiness one more than one or two occasions referenced in her complaint. The Complainant was hired and terminated by the same two individuals less than six months into her tenure thus negating any inference of age or gender discrimination. The Respondent and its agents knew or should have known of the Complainant's membership in these two protected classes at the time of hire.

### CONCLUSION:

For the foregoing reasons, a lack of probable cause finding is recommended.

Katherine M. Martin, Esq.
Supervisor

MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION
ONE ASHBURTON PLACE, ROOM 601, BOSTON, MA 02108
(617) 727-3990

## -DISMISSAL and NOTIFICATION of RIGHTS-

TO: Patrick K. B. Tracy, Esq.     Case: Guiman v. Boston College et al
     Iannella & Mummolo     Docket No: 01130438
     One Boston Place, Suite 3615     EEOC No: 16CA10997
     Boston, Ma 02108     Investigator: Katherine M. Martin, Esq.     MAR 2 4 2004

Your complaint has been dismissed for the following reasons:

[   ] The facts you allege fail to state a claim under any of the statutes the Commission enforces.

[   ] Respondent employs less than the required number of employees

[   ] Your complaint was not timely filed with the Commission, i.e. you waited too long after the date(s) of the alleged discrimination to file. Because it was filed outside the time limit prescribed by law, the Commission cannot investigate your allegations.

[   ] You failed to provide requested information, failed or refused to appear or to be available for necessary interviews/conference, or otherwise refused to cooperate to the extent that the Commission has been unable to resolve your complaint. You have had more than 30 days in which to respond to our written request.

[   ] The Commission's efforts to locate you have been unsuccessful. You have had at least 30 days in which to respond to a notice sent to your last known address.

[   ] The Respondent has made a reasonable settlement, offering full relief for the harm you alleged. 30 days have expired since you received actual notice of this settlement offer.

[ X ] The Commission issues the following determination. Based upon the Commission's investigation, the Commission is unable to conclude that the information obtained establishes a violation of the statutes. This does not certify that the Respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this complaint.

### -NOTICE of APPEAL-

If you wish to appeal the dismissal of your complaint and believe that the above stated reason for dismissal is incorrect, you may appeal to this Commission within 10 days after receipt of this notice. You or your attorney must make your appeal of the dismissal in writing to the appeals clerk of this Commission. Attention: Ms. Nancy To.

All employment complaints, where applicable, were filed by the MCAD with the Equal Employment Opportunity Commission. Our finding, which will be forwarded to its area office, JFK Federal Building, Boston, MA will be given substantial weight provided that such findings are in accordance with the requirements of Title VII of the Civil Rights Act of 1964, the ADEA, and/or the ADA, as amended.

Dorca I. Gomez
Investigating Commissioner

3/24/04
DATE

Cc: John B. Johnson, Esq.
     Corrigan, Johnson & Tutor, PA
     141 Tremont St
     Boston, MA 02111

received 3/24/04

Mr. Layne 617 565-320
EEOC ✓

The Commonwealth of Massachusetts
Commission Against Discrimination
One Ashburton Place, Room 601, Boston, MA 02108

Patrick K.B. Tracy, Esquire
Attorney at Law
One Boston Place, Suite 3615
Boston, MA 02108

JUN 3 0 2004

RE: Gwinan v. Boston College, et al
MCAD DOCKET NO: 01130438

Dear Parties:

On May 12, 2004 a preliminary hearing was held regarding the above reference complaint to consider the Complainant's appeal of lack of probable cause finding issued in this Complaint on March 24, 2004.

Based upon information presented at the appeal hearing and a review of the evidence adduced in investigation, I have determined that the Lack of Probable Cause finding in this case is affirmed. This means that investigation and appeal evidence fails to establish sufficient evidence to determine that an unlawful act of discrimination has been committed.

All employment complaints where applicable, are dual filed with the U.S. Equal Employment Opportunity Commission (EEOC). Our finding will be forwarded to its Area Office, JFK Federal Building, Boston, MA 02203. The MCAD finding will be given substantial weight by the EEOC provided that such finding are in accordance with the requirements of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, and or The Americans with disabilities Act of 1990.

Very truly yours,

Dorca I Gomez          MB
Investigating Commissioner

cc: John B. Johnson, Esquire
    Corrigan, Johnson & Tutor, PA
    141 Tremont Street
    Boston, MA 02111

# EXHIBIT 2

EEOC Form 101 (3/98)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: **Dorothy E. Gwinan**
    **15 Colby Rd.**
    **Roslindale, MA 02131**

From: **Boston Area Office**
    **John F. Kennedy Fed Bldg**
    **Government Ctr, Room 475**
    **Boston, MA 02203**

☐   *On behalf of person(s) aggrieved whose identity is*
    *CONFIDENTIAL (29 CFR § 1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16C-2001-00997 | **Anne R. Giantonio,** <br> **Intake Supervisor** | **(617) 565-3189** |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐   The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐   Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

☐   The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐   Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

☐   Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐   While reasonable efforts were made to locate you, we were not able to do so.

☐   You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☐   The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☒   The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐   Other *(briefly state)*

## - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

On behalf of the Commission

**Robert L. Sanders,**
**Area Office Director**

FEB - 2 2005

*(Date Mailed)*

Enclosure(s)

cc: **BOSTON COLLEGE, ET,AL**
    **140 Commonwealth Rd.**
    **Chestnut Hill, MA 02167**

# EXHIBIT 3

# Commonwealth of Massachusetts
## County of Middlesex
## Superior Court

Dorothy Guinan,

           Plaintiff(s)

   vs.

Boston College, James McIntrye, Tracey Lapan,

           Defendant(s)

CIVIL DOCKET# **MICV2004-03006**

## SUMMARY JUDGMENT M.R.C.P. 56

This action came on to be heard before the Court, Julian T. Houston, Justice, presiding, upon motion of the defendant(s), Boston College, James McIntrye, Tracey Lapan, for Summary Judgment pursuant to Mass. R. Civ. P. 56- the parties having been heard - and the Court having considered the *pleadings-depositions-answers to interrogatories-admissions- and affidavits, finds there is no genuine issue as to material fact and that the defendant is entitled to a judgment as a matter of law,

It is **ORDERED and ADJUDGED**:

That the Complaint of the Plaintiff (s), Dorothy Guinan be and hereby is **DISMISSED** against the Defendant (s), Boston College, James McIntrye, Tracey Lapan, with costs.

Dated at Cambridge, Massachusetts this 10th day of June, 2005.

........................................

Assistant Clerk

Entered: 06/10/2005

copies mailed 06/10/2005

COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF THE TRIAL COURT

MIDDLESEX; SS:

SUPERIOR COURT
CIVIL ACTION
NO. 01-3006

-----------------------------------------X

DOROTHY GUINAN,

       Plaintiff,

VS.

BOSTON COLLEGE, JAMES
McINTYRE, and TRACEY LAPAN,

       Defendants.

-----------------------------------------X

FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
FOR THE COUNTY OF MIDDLESEX

JUL 29 2004

_Edward J. Sullivan_
CLERK

## COMPLAINT AND JURY DEMAND

1.   The Plaintiff, Dorothy Guinan, at all times herein relevant is over forty years old and a resident of Roslindale, Suffolk County of the State of Massachusetts.

2.   The defendant, Boston College, is an entity doing, transacting and/or soliciting business in the Commonwealth of Massachusetts, has its principal place of business at 140 Commonwealth Avenue, Chestnut Hill, MA 02467.

3.   The defendant, Tracey Lapan, at all times herein relevant is an employee of Boston College.

4.   The defendant, James McIntrye, at all times relevant hereto is an employee of Boston College.

5.   Boston College, through its employees James McIntyre and Tracey Lapan, did terminate the Plaintiff, Dorothy Guinan, from her employment at Boston College.

6.   The Plaintiff, Dorothy Guinan, performed her job at Boston College at an acceptable level.

7.   Boston College, through its employees Dr. James McIntyre and Tracey Lapan, did replace the Plaintiff, Dorothy Guinan, with a Boston College student who is more than five years younger than Plaintiff.

## COUNT I
### (Employment Discrimination)

8.   Plaintiff repeats, realleges and reavers the allegations contained in paragraphs 1- 7 as if fully set forth herein and further allege and state as follows;

9.   Plaintiff was terminated from her employment at Boston College for reasons not based on a bona fide occupational qualification, specifically Defendants stated that Plaintiff was not a "clone" of Ms. Lapan or a male employee, Plaintiff has "generational differences" with Defendants, Plaintiff was "not a good fit" and Plaintiff was tardy because she was a "Mother" and needed to care for her seven-year old son.

10.  Plaintiff sustained injuries of body and mind, and has required, and will continue to require medical treatment and care.

11.  As a direct and proximate result of the conduct of Defendants Boston College, James McIntyre and Tracey Lapan, Plaintiff sustained the damages and injuries set forth above.

   WHEREFORE, Plaintiff demands judgment in the sum that the Court with Jury will award together with interests and costs against the Defendants Boston College, Tracey Lapan and James McIntrye.

## JURY DEMAND

Plaintiff hereby demands Trial by Jury.

                              Respectfully Submitted,
                              The Plaintiff,
                              By Her Attorney,

Dated: July 21, 2004

                              _____
                              Patrick K. B. Tracy BBO#501340
                              Law Offices of Patrick K.B. Tracy
                              One Boston Place, Suite 3615
                              Boston, MA 02108
                              Tel: 617-227-7139
                              Fax: 617-742-1424

# EXHIBIT 4



# BOSTON COLLEGE

OFFICE OF THE SENIOR VICE PRESIDENT

### Secretary II  Senior Vice President's Office  *Level 5*

This is a part-time (20 hours per week), benefits-eligible position.

The Secretary is responsible for preparing correspondence and speeches from dictaphone and written drafts, obtaining data from University departments to update speech statistics, answering phones, filing, processing mail, and greeting visitors. Other responsibilities include originating requisitions and purchase orders through the UBUY System. Will also assist other office staff as needed.

<u>Requires:</u>

High school diploma required; B.A./B.S. preferred; excellent editing skills (grammar and proofreading); accurate typing of 60+ wpm; PC experience including Windows '98, Microsoft Office, and FileMaker Pro; familiarity with e-mail and Netscape; self-starter with strong communication skills, flexibility, and respect for confidentiality.(Job Code: 216650004)

# DOROTHY GUINAN
# DEPOSITION

1

1                                   Volume: I

2                                Pages:  1 - 158

3           COMMONWEALTH OF MASSACHUSETTS

4           COMMISSION AGAINST DISCRIMINATION

5                  MCAD No. 01130438

6

7  DOROTHY E. GUINAN,

8           Complainant,

9      v.

10  BOSTON COLLEGE, JAMES McINTYRE and

11  TRACY LAPAN,

12           Respondent.

13

14

15                  **********

16        Deposition of Dorothy E. Guinan

17          Friday, July 20, 2001

18        Corrigan, Johnson & Tutor, P.A.

19           141 Tremont Street

20          Boston, Massachusetts

21             10:00 a.m.

22        Reporter:  Linda M. Grieco

23     210 South Street, Boston, MA 02111

24

5

1    you're going to answer yes or no to a question, to

2    say yes or no rather than nod your head because it's

3    easier for the reporter to take it down, all right?

4        A.   All right.

5        Q.   Good.  What is your full name, please?

6        A.   Dorothy E. Guinan.

7        Q.   You live in Roslindale; is that right?

8        A.   Yes, I do.

9        Q.   At what address?

10       A.   At number 15 Colby Road.  That's C-o-l-b-y.

11       Q.   Your social security number as I have it

12   from the numbers is 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.

13       A.   Yes.

14       Q.   What is your date of birth?

15       A.   I have to tell the truth on this one, huh?

16       Q.   You're sworn to tell the truth on all of

17   them.

18       A.   It's June 15, 1950.

19       Q.   Nothing wrong with that.

20       A.   No.

21       Q.   I understand you're widowed; is that right?

22       A.   Yes.

23       Q.   You have one child?

24       A.   Yes.

13

1  where my son is if he needed me, and it made sense.

2      Q.  Sure, okay.

3      A.  I mean, a good baseball thrower could throw

4  a ball from my home -- well, not quite.

5      Q.  Pedro probably?

6          MR. TRACY:  Not now.

7      Q.  Not now.  With that in mind, you saw the ad

8  for the open house, and you went over to BC in

9  December of 1999, correct?

10     A.  Yes.

11     Q.  You met with a woman named Milvia, and

12  Milvia was in some way in charge of hiring temp

13  people?

14     A.  Yes.

15     Q.  She didn't have anything to do, did she,

16  with the position you eventually took at

17  Dr. McIntyre's office?

18     A.  Yes, she did in that we had a discussion

19  about my capabilities, and I found out at that time

20  that BC did not hire temps outside.  That I had to

21  be hired by BC to be a temp, in-house temp.  So that

22  I didn't have the ability to say no, which was

23  important for me with Patrick at that time by

24  myself.

15

1    to get a job at Boston College?

2        A.  Well, I kind of -- if I'm not mistaken

3    Milvia had explained to me that there are periodical

4    jobs that come up part time, and to keep an eye out

5    and go on the web page.  I can't remember really

6    whether she telephoned me or grabbed me on the way

7    out, but I think she did telephone me at home, I was

8    surprised, to tell me that there was a position open

9    at BC, which was Dr. McIntyre's secretary.  With my

10   experience I remember her big thing was I had dealt

11   with confidential matters at Milton Academy.  I

12   worked for the principal over there for a few years,

13   and we had some prominent families there at the

14   time.  So she thought this might be something for me

15   to look into, which is what I did.

16       Q.  From there eventually you went through the

17   application process, and you eventually got the job

18   at Dr. McIntyre's office; is that right?

19       A.  Yes.

20       Q.  Did you ever have to interview with

21   Dr. McIntyre himself?

22       A.  Well, I met him.  I would not call it an

23   interview, no.  I would say no to that answer -- to

24   that question.

17

1    then started the process of applying for that job;

2    is that right?

3        A.  Yes, I did.

4        Q.  You knew at that point that it would be a

5    job as a secretary -- a part-time secretary; is that

6    right?

7        A.  Yes, I did.

8        Q.  Did you know the number of hours that were

9    going to be involved?

10       A.  Yes, I did.

11       Q.  How many hours were going to be involved?

12       A.  It was a 20-hour job.

13       Q.  Once you filed your application, with whom

14   did you meet at Boston College?  For instance, did

15   you meet with anybody in human resources?

16       A.  Yes.

17       Q.  Who did you meet with?

18       A.  The woman's name, a very nice woman, I

19   believe her name was Adelma Hossein or Hissein, like

20   H-o-s-s-e-i-n, or a variation on that.

21       Q.  Sure.  Okay.  What took place at that

22   meeting?

23       A.  Well, it was just a very relaxed kind of

24   meeting.  I was very confident about my ability to

26

1  started nine to one.  At certain points in time when

2  I found out that me just thinking that five minutes

3  was a flexibility that she was talking about if I

4  was five minutes late because Patrick was at school

5  and I had -- I was car pooling as well with four

6  other kids.  Pressure was starting coming on me by

7  Tracy.  I gave up the car pool.  I gave up -- I left

8  these people in the lurch and told them that I

9  needed to give it up, and I had to be responsible

10  only for Patrick because I had to go to two other

11  homes and make a big loop around my house to get the

12  other children.  The one or two days that they

13  helped me on the other end of that didn't seem worth

14  it anymore.

15      Q.  Well, when you started work on February 28,

16  2000, what time were you supposed to be there?  What

17  were your hours supposed to be?

18      A.  Nine to one.

19      Q.  Did they ever change that you were supposed

20  to be there at 8:30?

21      A.  Yes.  Okay, I basically started March -- I

22  probably sometime mid to late March that it was --

23  that Tracy had said to me -- I don't remember

24  whether she brought it up or I brought it up, the

27

1    thought that -- I know, this is kind of funny, I

2    used to go -- I dropped Patrick off at Jackson

3    School, and I would go up to Newton Center about 20

4    past eightish, around there, because he had to be in

5    school at that hour.  I would go to the Walgreens'

6    parking lot, and I would put on my makeup and -- I

7    would sit there putting on my makeup and reading my

8    Herald or Globe, and I would just get a cup of

9    coffee killing a half hour, basically around a half

10   hour's time.  When Tracy was aware of that, I don't

11   know how that came up, but she found -- I maybe

12   mentioned that to her one day or Chris, whatever,

13   that I was doing that every morning.  "Well, you

14   know,

15   Dr. McIntyre is in early, like 7:30ish and would

16   like to have someone in if you wanted to start at

17   8:30."  So we switched my hours from 8:30 for the

18   other half hour on the other end.

19        Q.  So that was sometime in March, as you

20   recall?

21        A.  If I'm thinking -- yeah, sometime around

22   there.

23        Q.  So your hours at that point based on what

24   you just told us changed from 8:30 to 12:30; is that

28

1    right?

2        A.   Yes.

3        Q.   In the summer time now, I've seen some

4    record, it might be in your answers to

5    interrogatories, but in the summer time it changed

6    back again.  So you started coming in at 9 o'clock

7    to one o'clock.

8        A.   Yes.

9        Q.   What was the reason, as you understood it,

10   for that change back to 9 o'clock in the summer

11   time?

12       A.   Well, for the simple reason that Patrick had

13   to go to camp every single week of the summer.  I

14   had no family network or no one to watch him, and I

15   had to get him to camps all over the place.

16       Q.   So because of the need for you to have --

17   not get Patrick into camp until 8:30 or 9 o'clock --

18       A.   They didn't start until 9 o'clock.

19       Q.   So were you the one who asked to change the

20   hours?

21       A.   Yes, I believe, but we talked about that

22   from the time we switched to 8:30 in that in the

23   summer time I knew when he got out of school I would

24   be faced with this problem.  I would be unsure how

37

1    But basically gave me -- I had to go that day --

2    excuse me, I just remembered that I had to go to

3    human resources first.  And I had to go to some kind

4    of an introductory meeting about the benefits

5    regarding health insurance and choosing it and the

6    paperwork involved with that.  So I don't believe I

7    got to the office itself, and they knew about this,

8    Tracy was aware this was going to happen, until

9    probably tenish.

10       Q.  Did someone at some point explain to you

11   what your responsibilities would be in this job as

12   the part-time secretary?

13       A.  Yes.

14       Q.  Who explained it to you?

15       A.  Tracy.

16       Q.  When did she explain it to you?

17       A.  Well, probably during our interview mostly.

18       Q.  Okay.  What did you understand from talking

19   with Tracy were to be your job responsibilities?

20       A.  Would be basically -- my main position would

21   be to type from Dr. McIntyre's dictaphone tapes.

22   That would be -- mostly that would be my primary

23   position, but as well as filing and answering

24   phones.  That was what I was told originally.  But

45

1    9 o'clock; is that right?

2        A.   That's correct.  But that would not have to

3    be told to me.  I knew my hours were 9 o'clock.  I

4    always worked -- my hours were nine to one.  I would

5    work nine to one give or take a detour on College

6    Road.

7        Q.   I'm not trying to get into that right now.

8        A.   I know.

9        Q.   What I'm trying to ask, and I think you've

10   answered yes, at some point Tracy did take you aside

11   and say, "We expect you, Dorothy, to be in at

12   9 o'clock and to be answering the phones starting at

13   9 o'clock;" is that right?

14       A.   I would say yes, but I would also say, can't

15   I, that --

16       Q.   You can say but.

17       A.   That is just -- of course I knew what my

18   hours were.  This was not said to other people.  I

19   was the one that was told me, but I was not told

20   that I was the only one responsible for being there

21   on the nose with no exceptions made.

22       Q.   Did you understand that Tracy was telling

23   you this because either she or other people in the

24   office felt you weren't getting there at 9 o'clock

46

1    to be there to answer the phones?

2        A.   Sure.

3        Q.   Is that correct, that you weren't there at

4    9 o'clock ready to answer the phones?

5        A.   The way you're asking me, would you say

6    regularly.  I'd say nom that does not happen

7    regularly.  On occasion I would say I never came in

8    much later than five to ten minute thing.  I would

9    also say it was after June 11th mostly, because that

10   is when Patrick got out of school, and this is when

11   things went nuts until he got in the Roche Center.

12   That doesn't start until mid July.  I knew I had a

13   month of craziness ahead of me, which was taking my

14   son to Babson College and have him suited up in the

15   hockey outfit to be on the ice at 8:30.

16       Q.   You're a hockey mom, too?

17       A.   Out of necessity.

18       Q.   I hope he's a good player.

19       A.   I try to negotiate with him given the value

20   of soccer and baseball, but I don't remember being

21   seven years old and having a passion for anything.

22   So I can't ignore his passion for hockey.  There are

23   worse things for him to love, I suppose.

24       Q.   I'm sure of that.  But I wasn't trying to

48

1   never said anything to me.  Everything was relayed

2   through Tracy.

3       Q.  "He" is Dr. McIntyre?

4       A.  That may have been the day that he told her

5   I was late, and she got me aside possibly, yes.  I

6   will say yes to that answer after a long convoluted

7   yes, yes.

8       Q.  Just so the record will be clear, when you

9   say "he may have pulled her aside," you're talking

10  about Dr. McIntyre?

11      A.  Yes.  I would also say, if I may, that his

12  being in the office at 7:30 in the mornings to

13  8 o'clock would probably seem I was really late if

14  he's been sitting around for an hour and a half or

15  an hour and I was getting in at five past nine on

16  particular days because of these matters, that it

17  would appear that I was just late because he was

18  there for so long before me.  And I was abutting his

19  office.  He saw me coming up the stairs, and I was

20  in his face, unlike people on the first floor.

21      Q.  At some point in time when you were talking

22  to Tracy, you've told us that she said to you that

23  Dr. McIntyre would have preferred to have hired a

24  male or a clone of Tracy; is that right?

49

1    A.  Yes.

2    Q.  Now, I'd like to find out when it was that

3    Tracy said that to you.  I know we went through some

4    answers to interrogatories here, and I asked you

5    that question in the interrogatories.  But I just

6    want to go back over some of the details, okay?

7    Keeping in mind that you started working there

8    February 28th, March 1st, that time period and you

9    finished working there the end of August 2000.  When

10   was it in that five-month or six-month period that

11   Tracy said that to you?

12   A.  I don't remember, but I know it was fairly

13   early on.  It wasn't in May or June.  It was

14   probably toward the beginning that this happened.

15   Q.  For instance, in one of the papers that I've

16   seen, and I don't know if I can put my hand on it

17   right now, it may have been in actually the

18   complaint you filed with the MCAD, there was a

19   reference that she said that to you when you were

20   hired.  Do you recall it being close to the time

21   when you started working there that she said that to

22   you?

23   A.  Well, you know, it depends on what you mean

24   by close.  I mean, it was such a short tenure, it

51

1  you.  I mean, in the first month at some point you

2  were talking to her, and can you tell me why you

3  were talking to her and what lead up to her saying

4  that to you?

5        A.  I don't remember the day or I only know the

6  context was probably because it was maybe a five or

7  ten minute late situation with my son.  Everything

8  was regarding my son or it may have been the day

9  that Patrick was sick and I had to get him out of

10  bed with one hundred two temperature and drive him

11  to Belmont to my sister's house, because they were

12  on my case so much about everything that I didn't

13  dare take a day off for that.  And I drove him to

14  Belmont in the back of my car with one hundred two

15  temperature to my sister's house to avoid calling in

16  sick.  That day I probably got in a little late,

17  maybe 15ish minutes going to Belmont.  And I got in

18  the office -- if I'm not mistaken it may have been

19  that day.  But it was about being late, and that is

20  the context in which that statement was made to me.

21        Q.  So as you recall it you were ten, fifteen

22  minutes late because of the circumstances with your

23  son that you just talked about.  You got into the

24  office, Tracy pulled you aside or maybe just went

54

1    preferred a clone of her or a male for this job.  So

2    I had to at that point think -- it could have been

3    taken either way.  The clone of her means this young

4    girl with no baggage or a male obviously with no

5    baggage or unless he was a gay gentleman that

6    adopted a child.  I have a friend that did that.  So

7    we could very well be talking about that nowadays.

8    I just again being -- I am not of that era where all

9    of these things would be like fingernails scraping

10   on a blackboard where some women who are 35 might be

11   freaked out by that kind of statement.  I just kind

12   of looked at and went, oh, my god, not surprising me

13   that he thought that.

14       Q.  You refer to another statement apparently

15   said in the same meeting in which Tracy said that,

16   she said to you that she had told Dr. McIntyre, "Who

17   else would you expect to apply for this job except

18   someone with mother's hours;" is that right?

19       A.  Yes.

20       Q.  Is that in the same conversation?

21       A.  I think it was, yes.  I'm pretty sure that

22   it was.  They were talking about my position,

23   obviously.  The part-time secretary, when he wanted

24   a male, this is what she was talking about at that

60

1    for sure.  But I know it was probably -- everything

2    was pretty much -- after June 11th I can almost --

3    because this is when all of this was hitting the fan

4    then.

5         Q.   But again this is something that Tracy said

6    to you supposedly quoting Dr. McIntyre?

7         A.   Yes.

8         Q.   Is Monica Dr. McIntyre's wife?

9         A.   Yes.  I don't believe she worked while she

10   had five kids, either.  Even if she did, so what.

11              MR. JOHNSON:  Off the record.

12              (Discussion off the record).

13        Q.   If we can divide up the time you worked at

14   Boston College, it seems to me that June 11th when

15   Patrick got off from school is sort of a dividing

16   date.

17        A.   Uh-hum.  And June 19th as well.  There's all

18   kinds of --

19        Q.   All right.  Well, June 19th I'm not sure

20   why, I'll find out why you remember that.

21        A.   July 19th, sorry.

22        Q.   Anyway, if we take the time period from when

23   you started working, February 28th through June

24   11th, were you criticized at all during that time

61

1    period by Tracy for the work you had been doing?

2        A.   I would say pretty much often, often.

3        Q.   In terms of the criticism of your work, was

4    that criticism in any way of the typing that you

5    did?

6        A.   Yes.

7        Q.   What were her typical criticisms during that

8    time period, let's say from when you started through

9    June 11?

10       A.   Things that were -- that I -- 98 percent of

11   the times considered judgment calls, like putting an

12   exclamation point after the word congratulations,

13   which I didn't feel obviously that would not be

14   technically wrong, but I didn't feel like I knew

15   Dr. McIntyre enough to know how he would emote an

16   exclamation point to that word.  Obviously I would

17   for me.  When I've cried congratulations, I would do

18   that.  But he gave me no inkling as to how he

19   would -- whether he would do that or not.  So I put

20   a period after it.

21       Q.   So when he dictated something like that, he

22   might say congratulations and then good to see you,

23   he wouldn't tell you what type of punctuation to

24   put; is that correct?

63

1    typing for what's been referred to as not setting up

2    the structure of the letter properly?

3        A.    I really -- when I reread that stuff, I'm

4    sure she did mention it to me once that I should put

5    it at such and such inches from the thing, which I

6    did after that.    Maybe, for whatever reason, maybe

7    once or twice.    I don't know.

8        Q.    So you were aware prior to June 11th that

9    there had been criticism of your typing work; is

10   that right?

11       A.    To me, on -- well, I'm not sure what you

12   mean by that, because --

13       Q.    By that I mean Tracy on at least several

14   occasions had criticized you because she didn't feel

15   the typing work you were putting out was correct?

16       A.    Yes.

17       Q.    Okay.

18       A.    I thought she was crazy, but that's my

19   opinion.

20       Q.    I understand that.    But I'm just asking

21   you --

22       A.    Yes, I say yes.

23       Q.    That you were aware and she criticized you?

24       A.    Yes.

64

Q.  She was your supervisor; is that right?

A.  Yes.

Q.  You realized in this job that you were reporting to her; is that right?

A.  Yes.

Q.  And you had to do the job the way the supervisor wanted it done?

A.  Yes, perfect.  That's what it was.  That's what I was told was expected of me, perfect.

Q.  Did she say that?

A.  Yes, she did.  "There is no room for error," I was told by Tracy Lapan.

Q.  When did she say that?

A.  Oh, a number of times.  A number of times she said that to me when I would bring something to her attention that I thought was not necessarily wrong, like congratulations.  And I never went to her in a mode where I was kind of looking for problems.  I just wanted to just say you know I thought maybe he meant that.  I'm a nice person. It's pretty simple stuff.  You can get a feel for me now.  I don't talk to you any differently than I did with her.  That's my nature.  So when these things came up, we just dealt with them I thought okay.

65

1    Little did I know there was probably a little note

2    going like this into my file.

3        Q.    Prior to June 11, 2000, had Tracy brought to

4    your attention or criticized you in any way for your

5    lateness?

6        A.    I'm sure, yes.

7        Q.    Prior to June 11 --

8        A.    Can I ask you what you mean by lateness?

9        Q.    What you refer to as tardiness, not being at

10    the job at 8:30 or 9 o'clock.

11        A.    I would have to say technically, yes, I was

12    spoken to if it was 9:04, when I was the one that

13    was spoken to and not others when they were 9:15

14    weren't spoken to.

15        Q.    And you were also told prior to June 11th on

16    at least one occasion, and perhaps more than once,

17    that you were expected to be at work at 9 o'clock so

18    that you could answer phones starting at 9 o'clock;

19    is that right?

20        A.    I will say that I'm not sure that is what

21    was said to me.  I know that I was told that I

22    should be at my desk at 9 o'clock.  When you say so

23    that I could answer phones at 9 o'clock, that

24    doesn't mean that other people weren't there at nine

81

1    matter.

2        Q.  Did you talk -- well, also let me ask you

3    this.  There is a reference in the letter to the

4    letter being a follow-up to an earlier meeting that

5    you had.  Now I know I asked you that in the -- you

6    remember that reference?

7        A.  I remember that because I had to think about

8    what she meant by a meeting.  I had to think about

9    that, because -- maybe you have that.

10        Q.  No, no, I'm not saying I have that.  I'm

11    asking you, as I did in the interrogatories, whether

12    there had been a prior meeting?

13        A.  Well, I think, as I answered in the

14    interrogatory, whatever Tracy may have considered a

15    meeting wouldn't necessarily be the same thing that

16    I would have considered a meeting, because I had

17    regular discussions with her.  She may have come

18    into my office and sat down.  That may have been her

19    definition of a meeting.

20        Q.  For instance, in the answer to interrogatory

21    number four referring to that very thing you said

22    there was a number of discussions and regular

23    criticisms about how and what I should do but mostly

24    what I should not do.  So there had certainly been,

82

1    as you say, regular discussions --

2        A.   Yes, absolutely.

3        Q.   Or a number of discussions prior to your

4    receipt of this letter, correct?

5        A.   Yes, yes.

6        Q.   You were upset by the letter clearly,

7    correct?

8        A.   Yes.

9        Q.   You were upset --

10       A.   But not in a yelling upset.

11       Q.   No, but you were upset, correct?

12       A.   Yes, I was.  I was stunned.  It was a quiet

13   upset.  I just kept shaking my head.

14       Q.   You were upset that a person, a young person

15   with authority like Tracy had given you this

16   criticism; is that right?

17       A.   No.

18       Q.   You weren't upset by that?

19       A.   Not at all.  I was upset by looking at those

20   phrases like grammatical and structural errors and

21   unexpected absences and thinking to myself this girl

22   is not just -- this girl.  That sounds bad.  I don't

23   mean to say it in that way.  I do mean to say it

24   that way.  I thought to myself this woman is not

84

1   same.  It was this thing that was after me, whatever

2   that means, Tracy Lapan slash Dr. McIntyre.  If you

3   look at my answers, I'm sure I jump between Tracy

4   and him, because I feel mostly it was probably her,

5   but it's his decision to allow this.

6       Q.  Did you that afternoon discuss it -- discuss

7   the contents of the letter at all with Tracy?

8       A.  No, she told me to leave and take the

9   weekend to go home and think about things on the

10  weekend.

11      Q.  When you came back on Monday, which now

12  would have been the 28th, I guess?

13      A.  Uh-hum.

14      Q.  We know the next big episode was August --

15      A.  25th.

16      Q.  25th, that Friday.

17      A.  I know.

18      Q.  Between Monday, August 20th, when you came

19  back to work and Friday morning, August 25th, when

20  you had your meeting with Tracy, was there any

21  discussion with Tracy during that time about what

22  had been in the letter?

23      A.  No, because I took the weekend to just think

24  about life and think about what the heck mistake I

86

1    days before I was so graciously asked to leave.

2         Q.   But during that week, that is Monday when

3    you went back to work until Friday when you had this

4    meeting with Tracy, was there any discussion between

5    you and Tracy about the letter or its contents?

6         A.   No, I don't think so.  No, no.

7         Q.   So --

8         A.   It was kind of a -- I went back and I just

9    kind of was trying to just take it all in that week.

10        Q.   You went back to work that week and you

11   worked from Monday through Thursday as you regularly

12   would do, your regular hours, your regular job?

13        A.   Yes, yes.

14        Q.   Now as I understand it, Thursday when you

15   left work as was your typical process, you left the

16   materials that you had typed from the tape

17   Dr. McIntyre dictated, you left those typed letters

18   with Tracy; is that right?

19        A.   Yes, I did.

20        Q.   When you came in the next morning those

21   letters, as was typical apparently, had been

22   returned to your desk with any changes or

23   corrections; is that right?

24        A.   Yes.

94

1    assistance.  I said, "If you'll listen to the tape,

2    you'll understand why I typed it."  She said, "I

3    will not."  I'll never forget it on my husband's

4    grave, on my mother's grave and my father's grave, I

5    will never forget the way she said it to me.  She

6    said, "I will not."  I was so surprised by that,

7    although I shouldn't have been by that time, but I

8    was surprised by that, because it occurred to me and

9    I wrote that in my interrogatory, she wanted me to

10   be wrong.  She was mad that I was fighting this

11   issue.

12        Q.  Well, she said she would not, and did you

13   ask her again to listen --

14        A.  I asked her again.  I said, "Please do me a

15   favor and just listen to it.  I'm very concerned

16   about this letter that you put in my file accusing

17   me of making mistakes all the time.  And I am just

18   interpreting this exclamation point as a stern

19   warning on something that I made a mistake, and I

20   don't really think I did.  If you just listen to

21   it."

22        Q.  Again she said no?

23        A.  She said, "I will not and I want you to

24   leave."  That's when she asked me to leave.  This

102

1    I'm saying now, I'm not a snide person and I didn't

2    say that.  That's not what I said.  But I'm telling

3    you at this table that I'm not snide.  I've never

4    been that way.  I said to her on the way out the

5    door, "Is this the way Carroll School teaches how to

6    deal with conflict," and she went ballistic.

7        Q.  What did she say?

8        A.  That's when she asked me to close the door.

9    She said, "I want you to leave my office now and

10   close the door on your way out."

11       Q.  Then what happened next?

12       A.  I closed the door and I left.  I thought

13   this is beating a dead horse.  I'm getting nowhere

14   here.

15       Q.  Did you make one more comment about

16   professionalism?

17       A.  Oh, well -- when I said to her that comment

18   about the Carroll School, she said to me, "That is

19   the most unprofessional thing."  And I said, "I've

20   always been a professional, and I still think I'm a

21   professional."  That's what I said, and that's what

22   I said.

23       Q.  Did you say to her, "I'll always be more

24   professional than you'll ever be"?

116

1   me in employment.  I thought oh, my god.  So he was

2   getting more and more uncomfortable with my just

3   sitting -- I was sitting on the chair facing him,

4   and I just -- he kept saying, "Why don't you just

5   get me your keys and I think it's best that you

6   leave."  When I said, "Look, I didn't do this."  He

7   said, "Look, I think that you're just not a good fit

8   for this place."  I said okay, I said, "Why?"  Then

9   the envelope things, and he said these are

10  generational differences, because he said that all

11  in one call, "They are generational differences and

12  judgment calls, but you're not a good fit."  This is

13  how he was trying to justify these things that were

14  said that I was just not a good fit for this office.

15  And I thought okay, I am being -- I've been asked to

16  leave better places than this, and I just realized

17  that I had to just leave.  I couldn't believe it.  I

18  was so mad because Patrick was on the duck tour that

19  day for his birthday.  Patrick's birthday was

20  August 26th, and he was going out on the duck tour

21  with a number of friends of mine.  He was going to

22  be celebrating -- they were celebrating his birthday

23  as well as something else, and I didn't take the day

24  to go because of all the problems they were giving

JONES, FRITZ & SHEEHAN
(617) 542-0039

119

1    question to her in a snide way.  I meant that in a

2    truly --

3         Q.  Did you say it in a snide way?

4         A.  No, I did not.  No, I did not.

5         Q.  The question we're talking about is the

6    reference to the Carroll School.

7         A.  No, I did not.  I did not.  I said is this

8    how -- I mean, I was really curious.  I was really

9    curious.  I was curious.  I thought, oh, my god.  I

10   thought, oh, my god, there is an age problem here.

11   You know, in retrospect and having had a year -- I

12   can't believe we're sitting here a year later and

13   I've still got a wound that I feel like it's a wound

14   that's fresh, that there was an age discrepancy.

15   Although I have worked with young kids before.  This

16   is not an age problem with this woman.  I don't want

17   to say -- don't say this woman.  That sounds snide.

18   I don't mean to sound that.

19        Q.  You certainly felt that Tracy had an issue

20   of trying to control the people who worked for her,

21   right?

22        A.  That's a word that first comes to mind.

23        Q.  That's a word you've used in your answers to

24   interrogatories?

120

1      A.   Yes.

2      Q.   You felt she had a control issue; isn't that

3  right?

4      A.   Yes, she took everything as a control thing.

5  If anything -- if I -- yes.

6      Q.   Did you feel that because you were her

7  elder, let's say, that she shouldn't have a control

8  issue like that with you?

9      A.   No, no.  I accepted early on, I knew what

10  the situation was when I went to work with her.  I

11  said to her one of the reasons you're so lucky to

12  get me, kiddingly at an interview is because I have

13  no ego.  My ego is very small.  I know what I'm

14  capable of.  I can sell K-mart into the Herald.  I

15  can sell Woolworth's into the Herald.  I can sell

16  NTW which is now NTD.  I was able to go down to

17  Virginia and persuade them with my sales skills to

18  do that.  Tracy, it's her turn to prove herself to

19  the world.  It's not mine.  I've already done all

20  that.  It was her turn.  I decided early on what

21  kind of a woman she was, and I chose not to lock

22  horns with this woman, because it was a no-win

23  situation for me.

24      Q.   So, at any rate, Dr. McIntyre asked you to

# TRACEY MCDEVITT DEPOSITION

1

VOLUME I
PAGES 1-69

COMMONWEALTH OF MASSACHUSETTS

MCAD Docket No. 01130438

DOROTHY GUINAN,                 )
          Claimant,             )
                                )
          v.                    )
                                )
BOSTON COLLEGE, et al.,         )
          Respondent.           )

          *  *  *  *  *  *  *  *  *

          DEPOSITION of TRACEY E. McDEVITT, a
witness called on behalf of Dorothy Guinan,
pursuant to the Massachusetts Rules of Civil
Procedure, before Mary E. Rinne, a
Registered Professional Reporter and Notary
Public in and for the Commonwealth of
Massachusetts, at Boston College, Brock
House, 78 College Road, Chestnut Hill,
Massachusetts, on Friday, November 16, 2001,
commencing at 11:07 a.m.

12

1    Q.   And how many people did you interview, if

2         you recall?

3    A.   I don't recall.  But I would say a few.

4    Q.   "A few" meaning how many?

5    A.   Three, four.

6    Q.   And you interviewed Ms. Guinan and you

7         obviously liked her and you hired her, is

8         that correct?

9    A.   I hired her, yes.

10   Q.   Did she interview with Doctor McIntyre?

11   A.   He met with her.  It was not a formal

12        interview.

13   Q.   Did she interview with anyone else?

14   A.   She may have met with our current secretary

15        at the time, Chris.  I was the only one who

16        actually interviewed her, though.

17   Q.   What was Chris's last name?

18   A.   Murphy.

19   Q.   So did Chris Murphy and Dorothy Guinan work

20        in the same office at the same time?

21   A.   Yes.

22   Q.   And so what was the description of the job

23        that Ms. Guinan got?

24   A.   It was the description that was posted on

13

1    the Human Resources home page which was for

2    Secretary II, part-time, Level 5 position.

3  Q.  What responsibilities and duties did

4    Ms. Guinan have in this position?

5  A.  Are you asking what she was given or what

6    the position was supposed to have?

7  Q.  Well, first, what was the position supposed

8    to have?

9  A.  That would include typing letters and file

10    memos from Dictaphone as well as handwritten

11    notes, answering telephones, filing, doing

12    purchasing requisitions through our U-BUY

13    system, sorting the mail and other office

14    duties as needed.

15  Q.  So for instance, sorting the mail, was she

16    given the mail every day?

17  A.  No.  The mailman would come and leave it on

18    the counter.

19  Q.  And was it just her responsibility to sort

20    the mail?

21  A.  In fact, I don't believe she ever sorted the

22    mail.  I was explaining to you that that was

23    one of the duties for that position, and you

24    had asked what the duties were versus what

16

```
1    Q.   Did anyone else do dictation in the office?

2    A.   Not specifically for their job.  However,

3         if, for instance, Ms. Guinan would leave at

4         one o'clock, if an important phone call

5         happened at three and Doctor McIntyre needed

6         something typed up quickly to get over to

7         Father Leahy, for example, someone else in

8         the office would probably step in and do it

9         as opposed to letting it sit for another

10        day.

11   Q.   How many people were in the office?

12   A.   Doctor McIntyre, myself, and two

13        secretaries, as well as work study students.

14   Q.   And would that all be on the second floor?

15   A.   No.  We occupy the first and second floor.

16   Q.   So is your office on the second floor?

17   A.   Yes, it is.

18   Q.   Is Doctor McIntyre's on the floor?

19   A.   Yes, it is.

20   Q.   Dorothy Guinan was on the second floor?

21   A.   Yes, she was.

22   Q.   Who else was on the second floor?

23   A.   That's it.  There's a technology consultant

24        that isn't in our department.  There are
```

17

```
 1        three individuals from technology that are
 2        in Brock House but aren't in our
 3        department.   But there is one on the second
 4        floor.
 5   Q.   Where was Chris Murphy?
 6   A.   First floor.
 7   Q.   Now, who held Dorothy Guinan's position
 8        prior to Dorothy Guinan?
 9   A.   Chris Murphy.
10   Q.   So she moved, obviously changed positions?
11   A.   That was done before I was employed here, so
12        I don't know what happened with that.
13   Q.   Can you describe Chris Murphy for me?
14   A.   In what sense?
15   Q.   Physically.
16   A.   Physically?
17             MR. JOHNSON:  You mean age or --
18   Q.   Age.  You know, what does she look like?
19   A.   She's a very pretty woman.  She's petite.
20        Five foot something.  Blondish hair.
21   Q.   How old is she?
22   A.   I don't know her exact age.
23   Q.   Approximately.
24   A.   Let's see.  She has a son who I believe is a
```

```
 1        senior in high school, so she's probably
 2        around 50.  Actually, in fact, I believe she
 3        told me she was celebrating her 50th
 4        birthday a summer ago or so, so she's around
 5        50, 51.
 6    Q.  Now, does someone occupy the position that
 7        Dorothy Guinan was in presently?
 8    A.  Yes.
 9    Q.  Who is that?
10    A.  Her name is Maureen Shea.
11    Q.  And how old is Maureen Shea?
12    A.  I don't know.
13    Q.  Approximately.
14    A.  Well, she has a daughter who's a sophomore
15        in college, so I would guess that she's
16        probably in her fifties.
17    Q.  When did Maureen Shea take the job?
18    A.  October 1st, 2001 was her first day here.
19    Q.  So was that position open for over a year?
20    A.  Yes.
21    Q.  Was it posted at all?
22    A.  Yes.
23    Q.  Were there any applicants for the job?
24    A.  Yes.
```

19

1   Q.  And what happened with the applicants?

2   A.  Well, Maureen Shea was an applicant and I

3       hired her.

4   Q.  That was about a year and a few months

5       later?

6   A.  Correct.

7   Q.  Prior to her, if you know, how many

8       applicants were there for the job?

9   A.  Six to eight would be my guess.

10  Q.  And were they unacceptable?

11  A.  I believe some of them were not qualified

12      for the position.

13  Q.  Were any qualified so that they were offered

14      the position?

15  A.  No, Maureen was the only one offered the

16      position.

17  Q.  So now, getting back to Dorothy Guinan, when

18      did you first notice or start to have a

19      problem with Dorothy Guinan's performance?

20  A.  I don't think I could give you an exact

21      date.  Are you speaking professionally with

22      errors in her work or --

23  Q.  We'll talk about that, yes.

24  A.  Okay, errors in her work.  I would say

G & M COURT REPORTERS & ASSOCIATES

20

```
 1        immediately.  However, I would also say that
 2        there is certainly a learning curve with
 3        every job, so I would expect errors early on
 4        from anyone as you learn the job, obviously.
 5   Q.   Was there any training given to her?
 6   A.   Are you asking formal training from the
 7        university or within the office?
 8   Q.   No, training from the office.  Within the
 9        office.
10   A.   There was some given, yes.
11   Q.   When she first took the job I believe in
12        February of 2000, who would train her?
13   A.   Me.
14   Q.   And was this the time that the conference
15        was going on?
16   A.   The conference took place about a week after
17        her start date.
18   Q.   So it's fair to say it was a pretty hectic
19        time?
20   A.   Yes.
21   Q.   And is it fair to say that a lot of your
22        time was spent concentrating on the
23        conference?
24   A.   Yes.
```

28

1    Q.   But on or about August 17th, did you have a

2         meeting with her?  2000.  August 17th,

3         2000.

4    A.   I gave her a letter on that date.  I'm not

5         sure if there was a meeting on that date.

6    Q.   Do you know if you had a meeting just prior

7         to that letter?

8    A.   Yes, I believe we did.

9    Q.   Can you tell me about that meeting?

10              MR. JOHNSON:  That's the letter if

11   you need to see it.

12              THE WITNESS:  Thank you.

13   A.   Basically, the meeting was about what was in

14        this letter.  That she needed to work on her

15        work ethic and that she was making many

16        errors in her work and that we needed her to

17        improve on that.

18   Q.   And these included grammatical and

19        structural errors?

20   A.   As well as typographical, yes.

21   Q.   And what would be the grammatical and

22        structural errors?

23   A.   Well, a grammatical error would be if a

24        sentence was incomplete, perhaps missing a

30

1    crucial in all areas of our jobs, but it is

2    also important for administrative issues

3    such as tardiness and unexpected absences."

4    Can you tell me what the unexpected absences

5    were?

6    A.   Those would be situations in which she was

7         more than a few minutes late.  She would be

8         up to an hour, hour and a half late without

9         calling me.

10   Q.   She did not call in?

11   A.   Not on every occasion, no.

12   Q.   Do you know how many times there were

13        unexpected absences?

14   A.   No, not offhand.

15   Q.   Did she ever inform you about an automobile

16        accident that she had?

17   A.   Yes.

18   Q.   Would that have been one of the unexpected

19        absences?

20   A.   No.  Because she took a personal day the

21        next day to deal with that situation.

22   Q.   And can you tell me at this time what she

23        had for personal days; what was available to

24        her for personal days, vacation days,

36

1    transcribe dictation, and give it to you and

2    then you made corrections on it and placed

3    it back on her desk?

4    A.   Yes.  I believe you meant the August 17th

5    letter, not meeting.

6    Q.   Okay.  I'm sorry.  And so did you have a

7    meeting or any type of confrontation with

8    Ms. Guinan on August 25th?

9    A.   I don't know if I would characterize it as a

10   meeting or a confrontation on either end.  I

11   would say an incident.

12   Q.   Okay.  Tell me what happened, please.

13   A.   I believe I came in from parking my car,

14   coming into the house, checked my in box,

15   got my mail and any other documents for the

16   day.

17            And just as I was sitting down at

18   my desk, I hadn't even turned my computer on

19   or put my purse down, Ms. Guinan came into

20   my office and was waving some papers at me

21   and said, "I don't understand this.  What is

22   this?  What is going on here?"

23            And I said, "Hold on a minute.  I

24   don't even know what you're waving at me.

37

1    If you could show them to me, I'd be more

2    than happy to go over them with you."

3         And she showed me the letters

4    and --

5    Q.  Do you know what letters those were?

6    A.  No, I don't because I don't believe they

7    were there afterward for me to look at.

8    Q.  Okay.  So go ahead.

9    A.  But on a couple of the letters -- for

10   instance, I believe this may have been one

11   of the letters.  And in this first line

12   there's no space after a period.  And I

13   pointed errors like that out to her.

14        MR. JOHNSON:  Just so the record

15   will be clear, we're referring to what's

16   been marked as Exhibit No. 1.  I'm sorry.

17        THE WITNESS:  That's okay.

18   A.  As well as I believe on one of the other

19   documents there was no punctuation at the

20   end of a sentence.  And when I pointed these

21   errors out to her, she shrugged and didn't

22   seem to have an explanation for why these

23   errors were still occurring.

24        And I said, "Dottie, this is what

38

1    we talked about.  This is what the letter

2    was about.  You really need to slow down and

3    proofread the letters before you hand them

4    to me, not just type what was said and hit

5    print.  But read them before you give them

6    to me and then I think you'd pick up a lot

7    of these errors before they come to me,

8    especially after six months of typing

9    them."

10   Q.  And what happened next?

11   A.  And she became very upset with me, very

12       emotional.  She was waving her arms around

13       and shaking her head, and her voice got much

14       louder.  I wouldn't necessarily characterize

15       it as yelling at me, but I didn't think it

16       was appropriate.

17           And she said that it was a joke

18       that I was in the MBA program at Boston

19       College.  I believe she said the Carroll

20       School, which is the name of our graduate

21       management school.  And I told her that that

22       was very inappropriate and that she needed

23       to leave.

24           And I said, "Perhaps if you'd like

40

```
 1   A.  No, I don't believe I did.  I can think of

 2       about two occasions in my entire employment

 3       here that I've closed my door.

 4   Q.  And did you have any other contact with her

 5       that morning?

 6   A.  No.

 7   Q.  And her schedule for that morning, she would

 8       have left about what time?

 9   A.  Twelve-thirty or one.  I forget which

10       schedule she was on then.  Either

11       twelve-thirty or one.

12   Q.  And so did anyone have any conversations, to

13       your knowledge, with her during that time

14       period?

15   A.  Not that I know of.

16   Q.  Did she ask you to listen to the tape at

17       that time?

18   A.  No.

19   Q.  Not at all?

20   A.  No.

21   Q.  Did you have a conversation with Doctor

22       McIntyre as a result of that incident?

23   A.  Yes.

24   Q.  And what was that conversation?
```

41

1    A.    I called him.  He was down at a vacation

2          home, and I called him to explain the

3          situation to him and to tell him that I was

4          very upset and shaken by it and was seeking

5          advice from him on what to do.

6    Q.    And what did he tell you?

7    A.    He said that he was very sorry that that

8          happened and it shouldn't have happened, and

9          that he would speak to Dottie on Monday.

10   Q.    And what did you do next?

11   A.    I did work for the day.

12   Q.    And did you see Ms. Guinan leave that day?

13   A.    I don't recall.

14   Q.    Can you tell me, if you know, what the

15         procedures are for terminating someone at

16         Boston College?

17   A.    I don't know specifically, no.

18   Q.    Are you familiar with the employee handbook

19         at all?

20   A.    Yes.

21   Q.    But you don't know what the procedures for

22         terminating someone are?

23   A.    No.

24   Q.    Prior to Ms. Guinan taking this position

47

1     resolving a situation with Ms. Guinan prior

2     to termination?

3  A.  No.

4  Q.  Are there any policies and procedures in

5     effect with Boston College that you would

6     speak to or confer with Human Resources in

7     regards to employees that you're having

8     difficulty with?

9  A.  I don't know.

10  Q.  Were there any responsibilities not given to

11    Dorothy Guinan specifically?  And if there

12    were, why were they not given to her?

13  A.  Are you asking about her job duties?

14  Q.  Yes.

15  A.  Yes.

16  Q.  And what were those?

17  A.  I explained earlier that this was the

18    purchase orders and requisitions through our

19    U-BUY system, as well as miscellaneous

20    office increased filing, working on

21    projects, mail, etc.  But the U-BUY would

22    definitely be the largest one.

23  Q.  And why didn't you give her those

24    responsibilities?

48

A.    I didn't think she could handle them.  She
      was having difficulty with the typing alone
      that I didn't think she could handle
      anything else.

Q.    The communications between Doctor McIntyre
      and Dorothy Guinan basically went through
      you, is that true?

A.    I would say for the most part, yes.  Unless
      it's a, Hello.  Good morning.  Have a good
      day.

Q.    So anything other than just greetings and
      that kind of thing, Doctor McIntyre would
      talk to you and you would talk to Dorothy
      Guinan, correct?

A.    It would either be verbal or written.

Q.    Correct.  But it would go through you?

A.    Yes.

Q.    Do you ever recall saying to Ms. Guinan that
      Doctor McIntyre didn't feel she was a good
      fit for the office?

A.    No.

Q.    Did you ever say that to Dorothy Guinan?

A.    No.

Q.    Did Doctor McIntyre ever say that to you?

# JAMES MCINTYRE
# DEPOSITION

1

<pre>
 1                                    VOLUME I
                                      PAGES 1-40
 2

 3

 4
               COMMONWEALTH OF MASSACHUSETTS
 5
                     MCAD Docket No. 01130438
 6

 7
         DOROTHY GUINAN,            )
 8            Claimant,             )                    COPY
                                    )
 9            v.                    )
                                    )
10       BOSTON COLLEGE, et al.,    )
              Respondent.           )
11

12            *  *  *  *  *  *  *  *

13

14            DEPOSITION of DR. JAMES P. McINTYRE, a

15       witness called on behalf of Dorothy Guinan,

16       pursuant to the Massachusetts Rules of Civil

17       Procedure, before Mary E. Rinne, a

18       Registered Professional Reporter and Notary

19       Public in and for the Commonwealth of

20       Massachusetts, at Boston College, Brock

21       House, 78 College Road, Chestnut Hill,

22       Massachusetts, on Friday, November 16, 2001,

23       commencing at 10:25 a.m.

24
</pre>

10

```
 1   A.   Several, sure.

 2   Q.   And at some point in time, you felt that

 3        Dorothy Guinan was not doing her job at BC,

 4        is that correct?

 5   A.   I felt -- yes, the bottom line was that she

 6        was unsatisfactory.

 7   Q.   And when did you first begin to think that?

 8   A.   I can't tell you exactly.  But I think

 9        almost from the beginning Tracey would give

10        me, you know, regular reports indicating

11        that, Well, this came in this way or this

12        came in that way.  And I think that was

13        fairly early on.

14   Q.   You can't be specific?

15   A.   No, I can't.  But I think again it was early

16        in her tenure.

17   Q.   Do you know how long she worked here?

18   A.   She worked here until the end of August of

19        that year, 2000.

20   Q.   And do you recall what happened just prior

21        to her termination?

22   A.   Well, I saw her.

23   Q.   Before we get there, can you tell me if

24        anything transpired between her and Tracey
```

G & M COURT REPORTERS & ASSOCIATES

12

```
 1        being very defensive in trying to explain,

 2        you know, why these things had been circled,

 3        that Dorothy really didn't see them as

 4        errors.

 5   Q.   And were you familiar with Dorothy Guinan's

 6        background?

 7   A.   Well, did you want to know more about that

 8        meeting?  Because also at that meeting, I

 9        mean, she allegedly said things like she

10        can't understand why Tracey's in the MBA

11        program, that Dorothy said that she was a

12        better manager than she was.  She thought

13        that it was a joke that Tracey was involved

14        in management.  It was a very insulting,

15        confrontive type meeting.

16   Q.   Can you tell me anything else that happened

17        at that meeting?

18             MR. JOHNSON:  This again is all

19        according to what Tracey told him.

20             THE WITNESS:  Exactly.  That's

21        right.  It's secondhand.  That's right.

22   A.   Not offhand, but there might be other

23        things.  I mean, I just don't recall them

24        offhand.  My impression was it was a very
```

14

1  that correct?

2  A.  That's correct.  Up until that time.  When I

3      subsequently saw Dorothy, she denied this or

4      denied some of the things that were said.

5  Q.  Do you know if there was a meeting between

6      Tracey Lapan and Dorothy Guinan prior to

7      August 25th?

8  A.  Yes.

9  Q.  And when was that?

10 A.  Roughly ten, twelve, fourteen, fifteen days

11     before at which time Tracey tried to review

12     with her -- basically to evaluate her job

13     performance which focused more on the

14     day-to-day work, the errors that were in the

15     correspondence, her punctuality, issues of

16     that sort.

17 Q.  Were you aware of any punctuality problems?

18 A.  Yes, I was.

19 Q.  And what were those?

20 A.  That she was not always on time.

21 Q.  And were you again aware of Dorothy Guinan's

22     background when she came to work here?

23 A.  Background meaning what?

24 Q.  Were you aware that she was a widow?

15

```
1    A.   Yes.
2    Q.   Were you aware that she had a child of
3         approximately eight years old?
4    A.   Yes.
5    Q.   At that time when she came to work here,
6         were considerations given to the fact that
7         she was a single mother with a seven-,
8         eight-year-old child?
9    A.   Well, I'm inclined to say yes, but I don't
10        know what that means.  I mean, what do you
11        mean, "considerations"?  I mean, we hired
12        her knowing all these things.
13   Q.   Were you aware that she had mentioned that
14        at her early interviews and that she had
15        addressed the problem of she may have
16        difficulty or may at some times be late for
17        work and that was --
18   A.   No.  I have no knowledge or recollection of
19        that.
20   Q.   So after the August 25th meeting with Tracey
21        Lapan and Dorothy Guinan, what happened
22        then?
23   A.   Tracey called me and told me about the
24        meeting.  And again, I just thought it was
```

16

1    totally, totally inappropriate,

2    unacceptable, insubordinate.  Just

3    everything was wrong with it, including poor

4    judgment.

5  Q.  And when is the next time you saw Dorothy

6    Guinan?

7  A.  I'm not sure.  Either the following Monday

8    or Tuesday.

9  Q.  And did you have a meeting with her then?

10  A.  I saw her very briefly and told her that I'd

11    like to talk to her sometime this morning.

12    And she said, "Fine."

13  Q.  And what happened?  Did you have a meeting

14    with her?

15  A.  No, no.  I didn't that day.  Because after I

16    had spoken to Tracey Lapan and I had decided

17    again that the whole thing was inappropriate

18    and something had to be done about it, I

19    called Leo Sullivan who's our vice president

20    of Human Resources.

21  Q.  When did you call Leo Sullivan?

22  A.  That Friday, I believe, when I spoke to

23    Tracey.

24  Q.  And he's the vice president --

17

A.   -- for Human Resources.

Q.   And what discussions did you have with Leo
Sullivan?

A.   I -- well, some personal things not having
to do with this issue, and then I brought up
this issue and told Leo I'd like to talk to
him about it.

Q.   And concerning these issues, what did you
say and what did he say?

A.   I basically relayed what had happened and
also gave some history of it. Probably told
him something about Dorothy's history at
Boston College.

        Probably shared -- and as a matter
of fact, I'm sure I shared with him, you
know, our observations with regard to her
performance, with respect to her punctuality
and typing and typographical errors and so
on.

Q.   What was Dorothy's Guinan's history at
Boston College?

A.   Well, in terms of time, I just gave it to
you.

Q.   So when you say --

18

1   A.   In terms of function, I gave it to you.  I
2        mean, what do you mean?
3   Q.   Well, you said you discussed her history at
4        Boston College with Mr. Sullivan.  Was there
5        something else?
6   A.   No.  No.  I mean, it was probably the two
7        categories I just mentioned to you: how long
8        she had been here, basically what she did.
9   Q.   And what did Mr. Sullivan say?
10  A.   We got together that weekend to discuss it
11       further.
12  Q.   And when did you get together that weekend?
13  A.   I've forgotten.  We got together for a
14       dinner.  I've forgotten whether it was
15       Saturday or Sunday.
16  Q.   And what were the conversations between you
17       and Mr. Sullivan?
18  A.   Well, again, the same issues that I just
19       mentioned that I mentioned to him on the
20       phone.  And the conclusion basically was,
21       Leo wanted to come back and check the
22       personnel records and then said, Let's get
23       together early in the week.
24  Q.   And did you get together early in the week?

19

```
 1   A.   Yes, we did.  And I think the reason I had
 2        said to Dorothy, I want to talk to you later
 3        today, I was hopeful of seeing Leo that
 4        morning, if it was Monday.  And I think Leo
 5        possibly couldn't see me.  We had to put it
 6        off until the next day, until Tuesday.
 7   Q.   And did you meet with him?
 8   A.   And I did meet with Leo on Tuesday.
 9   Q.   And what did you discuss then?
10   A.   Again, the same issues.  Leo consulted with
11        his records that he had of Dottie and felt
12        that, you know, it would be appropriate if I
13        wanted to notify Dorothy that she wasn't
14        working out and we should terminate her.
15   Q.   So he said it was okay to terminate her?
16   A.   Yes, he did.
17   Q.   Do you know what the procedure is for
18        terminating someone at Boston College?
19   A.   Well, yes, generally.  But I felt that I was
20        checking with Leo because he would be more
21        familiar with it than I am.
22   Q.   Are you aware that two weeks' written notice
23        is required to terminate someone at Boston
24        College, someone in Dorothy Guinan's
```

# DOROTHY GUINAN'S ANSWER TO INTERROGATORY NO. 4

COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

DOROTHY E. GUINAN,                      )
                                        )
        Complainant,                    )
                                        )
vs.                                     )
                                        )        MCAD NO. 01130438
BOSTON COLLEGE, JAMES                   )
McINTYRE, and TRACY LAPAN,              )
                                        )
        Respondents.                    )
                                        )

## COMPLAINANT DOROTHY E. GUINAN'S ANSWERS TO INTERROGATORIES PROPOUNDED BY THE RESPONDENT BOSTON COLLEGE

1.      With respect to the August 25, 200 meeting between Tracy Lapan and Dorothy Guina, please set forth fully and completely exactly what took place during this meeting, including how long the meeting lasted, where the meeting took place, who was present, and exactly what you said to Ms. Lapan and what Ms. Lapan said to you.

        A.      I met with Ms. Lapan in her office at the Brock House on the morning of August 25, 2000, sometime between 10:00-11:00 AM. The meeting was brief, probably not more than five to ten minutes. She was alone in her office working on her computer when I entered.

        When hired for the position as part-time Secretary, I was instructed that my typed material was given first to Ms. Lapan for review, and if there were any changes to be made, it would be returned to me for retyping before going to Dr. McIntyre in final form. This system made perfect sense to me, since I was not in any way involved with Dr. McIntyre's day to day activities, other than to type his dictation from a Dictaphone machine and to answer telephones. Ms. Lapan, on the other hand, met or spoke with Dr. McIntyre daily.

        Because of this, I relied on Ms. Lapan to thoroughly check what I typed since there were many names of students, applicants for Admission, various faculty and committee members, donors and members of Dr. McIntyre's family, who were unfamiliar to me. I understand this was the procedure in place with Ms. Lapan's predecessor. When I arrived in the office on Friday, August 25, 2000, a stack of Dr. McIntyre's correspondence typed the previous day was on my desk with Ms. Lapan's changes.

        About two weeks prior to this, as I was leaving for the weekend, Ms. Lapan stopped me to hand me a letter informing me that both she and Dr. McIntyre were unhappy with my performance. The letter puzzled me, using very non-specific words such

1

sometimes." What to me was a back-up plan of a second pair of eyes checking all correspondence became a twisted, distorted picture of my job performance leading to my termination.

For the record, I state unequivocally that nothing I was responsible for left the office with an error. If there were any, they were caught and changed. I'm unsure whether this could be said of others at the Brock House where I'm aware of other, more serious blunders than any made by me. I even have in my file a thank you note given to me for my help in sorting out confusion caused by one such blunder.

4.    Prior to your receipt of a letter dated August 17, 2000 from Tracy Lapan detailing the concerns which she and Dr. McIntyre had about your job performance, had you met in person with Ms. Lapan to discuss these concerns? If so, please state when this meeting took place where it was held and exactly what was said to you by Ms. Lapan and what you said to Ms. Lapan.

A.    Other than the date on which Ms. Lapan gave me the August 19th letter, I do not recall any meetings discussing my performance. I was half expecting one because the position of part-time Secretary was in the category of "Office/Clerical" and there is a probationary period of four months, which in my case was the end of June. Since Ms. Lapan mentioned nothing to me about this, I assumed that no news was good news.

There was a number of discussions and regular criticisms about how and what I should do, but mostly what I should not do. These "discussions" took place regularly as Ms. Lapan returned work to my office for retyping or to give instructions. I would describe this as perhaps what Ms. Lapan may refer to as "meetings." As stated earlier, because I was I hired right at the beginning of the Finance Conference 2000, I was given little or no training as to my office procedures and muddled through the best I could.

When I was hired and had questions, Ms. Lapan was often quite short with me, instructing me to go downstairs and Chris Murphy would help me. She was quite annoyed when I interrupted her and I often wondered as a grad student, if she was working on her own school work. Chris Murphy herself was inundated with the Finance Conference 2000 and did her best to help me in between her own work. If Ms. Lapan needed to locate something and it was not where she wanted it, I was at that time told in a very brash manner what was expected or where something should be kept. This type of regular interaction with Ms. Lapan constituted my training and the learning process for me at 78 College Road.

Ms. Lapan' stern orders involved everything from how many rings were allowed before answering the telephone to where things should be filed. Instructions were also given to help anyone calling or coming to the office. When I attempted to do this and tried to be more pro-active (one of Ms. Lapan's criticisms of me) I was reprimanded. Three incidents that stick out in my mind because I was so shocked by them are listed below:

1.    A student from an Asian country came to the office looking for prescription eyeglasses her mother mailed from home and she thought the package was mailed to 78 College Road. I attempted to search them down, calling the Mail Center, the courier service and then Christine Murphy who had recently transferred to the School of Nursing.

2.    A parent of one of the year 2000 graduates called to inquire about a handicap

5

# JAMES MCINTYRE AFFIDAVIT

UNITED STATE DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DOROTHY GUINAN,<br>           Plaintiff,<br><br>v.<br><br>BOSTON COLLEGE, JAMES P.<br>MCINTYRE, and TRACEY LAPAN,<br>           Defendants. | )<br>)<br>)<br>)<br>)   C.A. No. 05-10805DPW<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF DEFENDANT JAMES P. MCINTYRE

I, James P. McIntyre, hereby depose and say of my personal knowledge:

1.     I am Senior Vice President at Boston College, and a defendant in this action brought by Dorothy Guinan.

2.     Ms. Guinan began to work in my office at Boston College as a part-time secretary on February 28, 2000, and her employment at the college and in my office was terminated on August 29, 2000.

3.     The attached letters dated September 22, 2000 and October 6, 2000 are true copies of letters which I sent to Ms. Guinan regarding her termination.

Signed under the pains and penalties of perjury this _18th_ day of May, 2006.

_James P. McIntyre_
James P. McIntyre



# BOSTON COLLEGE

<small>OFFICE OF THE SENIOR VICE PRESIDENT</small>

September 22, 2000

Ms. Dorothy E. Guinan
15 Colby Road
Roslindale, MA  02131

Dear Dottie:

This letter is to confirm my conversation with you on August 29th, 2000, that effective August 29th, 2000, your employment in the Office of the Senior Vice President was terminated.

The reason for your termination was your less than satisfactory performance during your short time employed in this office, after receiving a letter dated August 17th, 2000 that advised you that your performance was not meeting our office standards.

If you should have any further questions or concerns regarding this matter, please direct them to the Office of Human Resources at 552-3330.

Sincerely,

Dr. James P. McIntyre
Senior Vice President

cc: Personnel File

<small>BROCK HOUSE, 78 COLLEGE ROAD, CHESTNUT HILL, MASSACHUSETTS 02467-3837
TEL 617-552-3246 FAX 617-552-8084</small>



# BOSTON COLLEGE

OFFICE OF THE SENIOR VICE PRESIDENT

October 6, 2000

Ms. Dorothy E. Guinan
15 Colby Road
Roslindale, MA  02131

Dear Ms. Guinan:

This letter is in response to your grievance dated September 28, 2000.  First, I unequivocally deny your allegation that you were terminated because of your age, gender or parental status.  Secondly, I want to repeat what I told you on August 29th, that the reason for your termination was your unsatisfactory performance.

You were hired on February 28, 2000.  Between that time and August 17, 2000 you had a number of discussions with Ms. Lapan, your immediate supervisor, concerning issues with respect to your work and attendance. On August 17th you received a letter from Ms. Lapan that made it clear that you needed to improve in several areas, including your attention to detail in your typing of correspondence for the Office, and your attendance and punctuality in order to meet our expectations.

On August 25, 2000 you engaged in a discussion with Ms. Lapan, which I told you was unacceptable, inappropriate, and insubordinate.  Such statements as you made in that discussion are destructive to the kind of work environment I feel is important for this office.  When I spoke to you about this incident on August 29, 2000 I did not feel your explanation of what transpired between you and Ms. Lapan was satisfactory.

Therefore, the reason for your termination was that you were a short term employee who had been talked to about your performance and attendance, had received a letter on August 17, 2000 pointing out these problem areas and then subsequent to receiving that letter engaged in conduct towards Ms. Lapan that I considered to be unacceptable.

As I told you on August 29th, I am sorry that it had to come to this but based on all of the above reasons, I did come to the conclusion that you were not "a good fit" for the Office of the Senior Vice President.

Sincerely,

Dr. James P. McIntyre
Senior Vice President

cc: Tracey E. Lapan, Leo V. Sullivan, Bernard R. O'Kane, Barbara Marshall

BROCK HOUSE, 78 COLLEGE ROAD, CHESTNUT HILL, MASSACHUSETTS 02467-3837
TEL 617-552-3246 FAX 617-552-8084

# <u>TRACEY MCDEVITT AFFIDAVIT</u>

UNITED STATE DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOROTHY GUINAN,                          )
                    Plaintiff,           )
                                         )
                                         )
v.                                       )        C.A. No. 05-10805DPW
                                         )
BOSTON COLLEGE, JAMES P.                 )
MCINTYRE, and TRACEY LAPAN,              )
                    Defendants.          )
                                         )

## AFFIDAVIT OF TRACEY E. MCDEVITT

I, Tracey McDevitt, hereby depose and say of my personal knowledge:

1.      My maiden name is Tracey E. Lapan, and I am a defendant in this action brought by Dorothy Guinan.

2.      In 2000, I was employed at Boston College working in the Office of the Senior Vice President.  I worked as an assistant to Senior Vice President James McIntyre.

3.      On February 28, 2000 until August 29, 2000, Dorothy Guinan worked in our office as a part-time secretary, and I was her supervisor.

4.      The attached letter dated August 17, 2000 is a true copy of the letter which I wrote and which I hand delivered to Dorothy Guinan on August 17, 2000.

Signed under the pains and penalties of perjury this ___22nd___ day of May, 2006.


                                         _Tracey E. McDevitt_
                                         Tracey E. McDevitt



## BOSTON COLLEGE

OFFICE OF THE SENIOR VICE PRESIDENT

August 17, 2000

Ms. Dorothy A. Guinan
Office of the Senior Vice President
Brock House

Dear Dottie:

This letter is intended to serve as a follow-up to our meeting earlier this month. I would like to highlight some of the issues we discussed as well as hear from you any corrective action you plan.

One example of this that both Dr. McIntyre and I have some concerns is your lack of attention to details necessary for this position. Many of the typed letters you have submitted for signature contain errors, including typographical, grammatical, and structural ones. It is crucial that all materials generated from our office are error-free.

We also discussed the importance of your displaying greater job discipline, in terms of attendance, as well as focus. As our office has such a small staff, we rely on each other in more ways than one. Communication is crucial in all areas of our jobs, but is also important for administrative issues such as tardiness and unexpected absences.

Overall, we are concerned that you are not meeting our office standards. As this office is highly visible to both those on and off campus, it is important that we maintain high levels of attention to detail and accuracy in both written and verbal communication.

I want us to review these concerns in 30 days. Please feel free to discuss any suggestions you may have with either Dr. McIntyre or myself.

Sincerely,

Tracey E. Lapan
Assistant to the Senior Vice President