UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOROTHY GUINAN,                         )
     Plaintiff,                          )
                                        )
vs.                                     )       C.A. NO.: 05-10805DPW
                                        )
BOSTON COLLEGE, JAMES P.                )
MCINTYRE, and TRACEY LAPAN,             )
     Defendants.                         )
_____    )

## AFFIDAVIT OF MATTHEW W. PERKINS

I, Matthew W. Perkins, do under oath depose and say:

1. I am an attorney licensed to practice before the State and Federal Courts in
   the Commonwealth of Massachusetts and am an associate with the law
   firm of Lecomte, Emanuelson and Doyle, attorneys for the Plaintiff. As
   such, I have personal knowledge of the facts stated herein and if called as
   a witness, I could and would competently testify thereto.

2. Attached hereto as **Exhibit 1** are true and accurate copies of pages 19, 25,
   27-28, 37-38, 45-47, 53-54, 62-63, 78-79, 87-91, 93-94, and 115-116 of
   the deposition of Dorothy Guinan.

3. Attached hereto as **Exhibit 2** are a true and accurate copies of pages 7, 9-
   10, 12, and 15 of the deposition of Dr. James McIntyre.

4. Attached hereto as **Exhibit 3** is a true and accurate copy of Dorothy
   Guinan's Answers to Interrogatories.

5. Attached hereto as **Exhibit 4** is a true and accurate copy of page 15 of the
   deposition of Tracy Lapan.

6.  Attached hereto as **Exhibit 5** are true and accurate copies of pages 6-7, 10,

18, 28-30, and 41 of the deposition of Christine Murphy.

Signed under the pains and penalties of perjury this 21st day of June 2006.

Matthew W. Perkins

EXHIBIT 1

19

1       A.   I believe I was interviewed with -- yes,

2   yes.

3       Q.   Were you also interviewed by Tracy Lapan?

4       A.   Yes, which is L-a-p-a-n.

5       Q.   So both of those ladies interviewed you

6   then; is that right?

7       A.   Yes.

8       Q.   Was that the same day when they interviewed

9   you?

10       A.   No, I believe Chris was not in that day, if

11   I can remember correctly.  I met with Chris I think

12   after Tracy.

13       Q.   So the first time --

14       A.   Maybe the other way around.  I'm not

15   positive of that right now.

16       Q.   That's not important.

17       A.   I could look back and find out.

18       Q.   Let me ask you about that.  Do you have some

19   sort of records or diary that you kept concerning

20   your work at Boston College?

21       A.   What do you mean by a diary?  Do you mean by

22   appointment book when I had appointments for Tracy

23   for my interview and for my skills test, which was a

24   separate situation as well?

25

1    Q.  Was there a discussion during those meetings

2  as to your need for flexibility?

3    A.  No, there was never any mention of that,

4  other than on my interview with Tracy.  I had

5  expressed my concerns.  I expressed my concern about

6  going back to work.  The reason I was trying to

7  explain the blip that happened in my work record

8  since people are very focused on these, these days.

9  I was explaining my concern about not having a great

10  network to take care of my son.  Patrick was, you

11  know, he was at that time what, seven, just turning

12  seven.  I was concerned about that.  I said one of

13  the reasons I haven't gone back to work is because

14  he was so young.  She assured me that there would be

15  flexibility regarding his -- my care, my providing

16  for him.

17    Q.  She being Tracy?

18    A.  Yes.  She assured me of that.

19    Q.  What did you understand your work hours were

20  to be when you started work?

21    A.  They were to be nine to one.  Nine to one.

22    Q.  Was there ever a time when you were supposed

23  to start at 8:30?

24    A.  In the summer time -- no, I'm sorry.  I

27

1    thought that -- I know, this is kind of funny, I

2    used to go -- I dropped Patrick off at Jackson

3    School, and I would go up to Newton Center about 20

4    past eightish, around there, because he had to be in

5    school at that hour.  I would go to the Walgreens'

6    parking lot, and I would put on my makeup and -- I

7    would sit there putting on my makeup and reading my

8    Herald or Globe, and I would just get a cup of

9    coffee killing a half hour, basically around a half

10    hour's time.  When Tracy was aware of that, I don't

11    know how that came up, but she found -- I maybe

12    mentioned that to her one day or Chris, whatever,

13    that I was doing that every morning.  "Well, you

14    know,

15    Dr. McIntyre is in early, like 7:30ish and would

16    like to have someone in if you wanted to start at

17    8:30."  So we switched my hours from 8:30 for the

18    other half hour on the other end.

19        Q.  So that was sometime in March, as you

20    recall?

21        A.  If I'm thinking -- yeah, sometime around

22    there.

23        Q.  So your hours at that point based on what

24    you just told us changed from 8:30 to 12:30; is that

28

1    right?

2        A.   Yes.

3        Q.   In the summer time now, I've seen some

4    record, it might be in your answers to

5    interrogatories, but in the summer time it changed

6    back again.  So you started coming in at 9 o'clock

7    to one o'clock.

8        A.   Yes.

9        Q.   What was the reason, as you understood it,

10   for that change back to 9 o'clock in the summer

11   time?

12       A.   Well, for the simple reason that Patrick had

13   to go to camp every single week of the summer.  I

14   had no family network or no one to watch him, and I

15   had to get him to camps all over the place.

16       Q.   So because of the need for you to have --

17   not get Patrick into camp until 8:30 or 9 o'clock --

18       A.   They didn't start until 9 o'clock.

19       Q.   So were you the one who asked to change the

20   hours?

21       A.   Yes, I believe, but we talked about that

22   from the time we switched to 8:30 in that in the

23   summer time I knew when he got out of school I would

24   be faced with this problem.  I would be unsure how

37

1    But basically gave me -- I had to go that day --

2    excuse me, I just remembered that I had to go to

3    human resources first.  And I had to go to some kind

4    of an introductory meeting about the benefits

5    regarding health insurance and choosing it and the

6    paperwork involved with that.  So I don't believe I

7    got to the office itself, and they knew about this,

8    Tracy was aware this was going to happen, until

9    probably tenish.

10       Q.   Did someone at some point explain to you

11   what your responsibilities would be in this job as

12   the part-time secretary?

13       A.   Yes.

14       Q.   Who explained it to you?

15       A.   Tracy.

16       Q.   When did she explain it to you?

17       A.   Well, probably during our interview mostly.

18       Q.   Okay.  What did you understand from talking

19   with Tracy were to be your job responsibilities?

20       A.   Would be basically -- my main position would

21   be to type from Dr. McIntyre's dictaphone tapes.

22   That would be -- mostly that would be my primary

23   position, but as well as filing and answering

24   phones.  That was what I was told originally.  But

38

1    then I think Tracy decided, as I went along, to add

2    a few things to that.

3        Q.   With respect to the filing, was there a

4    certain system they asked you to follow in filing?

5        A.   Not when I was hired, no.  As a matter of

6    fact, that was obviously -- in all the paperwork

7    here, that was one of the things they said.  I would

8    just state that whenever anything was done

9    incorrectly, I was told that it was wrong and told

10   then how to do it.  From that point on I always put

11   things where they belonged.  I left -- at the

12   beginning they were just -- to say the least it was

13   frantic craziness going on in that office during the

14   finance conference.  They had a lot of

15   responsibility of it.  That includes everything

16   about parking, all the -- the whole gamut.  So I

17   would just keep things on my desk until I could grab

18   Chris for a question or whatever.  I essentially --

19   that was my training.  That's what I would say my

20   training was.  When someone said no to me, and then

21   I found out how to do it, that was how I was trained

22   for this position.

23       Q.   So it was on-the-job learning experience?

24       A.   Yes, it was.  That's a way to put it.

45

1   9 o'clock; is that right?

2        A.  That's correct.  But that would not have to

3   be told to me.  I knew my hours were 9 o'clock.  I

4   always worked -- my hours were nine to one.  I would

5   work nine to one give or take a detour on College

6   Road.

7        Q.  I'm not trying to get into that right now.

8        A.  I know.

9        Q.  What I'm trying to ask, and I think you've

10  answered yes, at some point Tracy did take you aside

11  and say, "We expect you, Dorothy, to be in at

12  9 o'clock and to be answering the phones starting at

13  9 o'clock;" is that right?

14       A.  I would say yes, but I would also say, can't

15  I, that --

16       Q.  You can say but.

17       A.  That is just -- of course I knew what my

18  hours were.  This was not said to other people.  I

19  was the one that was told me, but I was not told

20  that I was the only one responsible for being there

21  on the nose with no exceptions made.

22       Q.  Did you understand that Tracy was telling

23  you this because either she or other people in the

24  office felt you weren't getting there at 9 o'clock

46

1    to be there to answer the phones?

2       A.   Sure.

3       Q.   Is that correct, that you weren't there at

4    9 o'clock ready to answer the phones?

5       A.   The way you're asking me, would you say

6    regularly.  I'd say nom that does not happen

7    regularly.  On occasion I would say I never came in

8    much later than five to ten minute thing.  I would

9    also say it was after June 11th mostly, because that

10   is when Patrick got out of school, and this is when

11   things went nuts until he got in the Roche Center.

12   That doesn't start until mid July.  I knew I had a

13   month of craziness ahead of me, which was taking my

14   son to Babson College and have him suited up in the

15   hockey outfit to be on the ice at 8:30.

16      Q.   You're a hockey mom, too?

17      A.   Out of necessity.

18      Q.   I hope he's a good player.

19      A.   I try to negotiate with him given the value

20   of soccer and baseball, but I don't remember being

21   seven years old and having a passion for anything.

22   So I can't ignore his passion for hockey.  There are

23   worse things for him to love, I suppose.

24      Q.   I'm sure of that.  But I wasn't trying to

47

1   say that you always got in after nine or you never

2   got in after nine or whatever.  All I'm trying to

3   say is you were at times, whether it was

4   occasionally or more often, you would get in after

5   9 o'clock; is that right?

6        A.  No later than ten minutes, perhaps.

7        Q.  At some point Tracy pulled you aside and

8   said, "Dorothy, look, we expect you to be in here at

9   9 o'clock to answer the phones;" is that right?

10        A.  Oh, she pulled me aside often.

11        Q.  But did she pull you aside at some point and

12   tell you that?

13        A.  She -- there was probably a specific day for

14   whatever reason, I don't remember, maybe it was the

15   Babson week.  That was a crazy week with hockey.

16        Q.  But whenever it was, I'm not asking you to

17   pin it down for me.

18        A.  I know, I know, I know.  I'm just

19   remembering that horrendous week where I had cups

20   and plates and things and not knowing what the hell

21   to do with hockey and getting him to Babson suited

22   up.  And I thought I was doing a good job, and I

23   went in there and he would give me -- well, that's

24   probably one of the days that he got her aside.  He

53

1    to me by Tracy.  Whether it was said to him, too, I

2    don't know.  I don't want to tell a lie about that.

3    So she was trying to in her -- as far as I'm

4    concerned, in her weird way trying to at least offer

5    a sense of understanding about my situation that

6    day.  It was at that time that she kind of made it

7    in a light -- in a lightened way.  Well, he really

8    said that he would prefer for your job -- I think

9    what I might have said something about I thought

10   that this is what flexibility meant when you told me

11   that I'd be flexible about these matters, that this

12   is what you meant by that.  She kind of made light

13   of it then.  Whether she said it was her grandfather

14   was cranky and she kind of made light of

15   Dr. McIntyre being cranky at times.

16        Q.  Did she say that?

17        A.  Yes, to me, to me.

18        Q.  This was all in the same meeting or

19   discussion when she said Dr. McIntyre would have

20   preferred -- strike that.  What did she say?

21        A.  I think it may have been.

22        Q.  What did she say?

23        A.  I think it may have been.  She would have

24   preferred -- she said Dr. McIntyre would either have

54

1    preferred a clone of her or a male for this job.  So

2    I had to at that point think -- it could have been

3    taken either way.  The clone of her means this young

4    girl with no baggage or a male obviously with no

5    baggage or unless he was a gay gentleman that

6    adopted a child.  I have a friend that did that.  So

7    we could very well be talking about that nowadays.

8    I just again being -- I am not of that era where all

9    of these things would be like fingernails scraping

10   on a blackboard where some women who are 35 might be

11   freaked out by that kind of statement.  I just kind

12   of looked at and went, oh, my god, not surprising me

13   that he thought that.

14       Q.  You refer to another statement apparently

15   said in the same meeting in which Tracy said that,

16   she said to you that she had told Dr. McIntyre, "Who

17   else would you expect to apply for this job except

18   someone with mother's hours;" is that right?

19       A.  Yes.

20       Q.  Is that in the same conversation?

21       A.  I think it was, yes.  I'm pretty sure that

22   it was.  They were talking about my position,

23   obviously.  The part-time secretary, when he wanted

24   a male, this is what she was talking about at that

62

1      A.   No.

2      Q.   He'd leave it up to you?

3      A.   He would leave it -- yes, yes.

4      Q.   Were there any criticisms during this time

5   period relating to mistakes that you had made?  For

6   instance, I know there's been references in your

7   materials to being criticized for -- in terms of

8   listing the year.  You might have put 200 instead of

9   2000.  There's been a reference --

10     A.   Are you saying on a regular basis?

11     Q.   I'm not saying on a regular basis.  I'm

12  saying if you were criticized at all during that

13  period of time by Tracy?

14     A.   I wouldn't be surprised once or twice.

15     Q.   For not putting doctor in front of

16  McIntyre's name?

17     A.   Maybe that happened.  I'm sure that it did.

18     Q.   I'm sure -- I'm just asking you.

19     A.   Yes, I know.  And you're not her.  So I'm

20  not going to get snide.

21          MR. TRACY:  Just listen to the question

22  and answer his question.

23     A.   Okay.

24     Q.   Were you criticized at all in terms of your

63

1    typing for what's been referred to as not setting up

2    the structure of the letter properly?

3        A.   I really -- when I reread that stuff, I'm

4    sure she did mention it to me once that I should put

5    it at such and such inches from the thing, which I

6    did after that.  Maybe, for whatever reason, maybe

7    once or twice.  I don't know.

8        Q.   So you were aware prior to June 11th that

9    there had been criticism of your typing work; is

10   that right?

11       A.   To me, on -- well, I'm not sure what you

12   mean by that, because --

13       Q.   By that I mean Tracy on at least several

14   occasions had criticized you because she didn't feel

15   the typing work you were putting out was correct?

16       A.   Yes.

17       Q.   Okay.

18       A.   I thought she was crazy, but that's my

19   opinion.

20       Q.   I understand that.  But I'm just asking

21   you --

22       A.   Yes, I say yes.

23       Q.   That you were aware and she criticized you?

24       A.   Yes.

1    mentioned with Dr. McIntyre's interview that day,

2    and sat down and gave it to me and asked me to read

3    it.  I can't say that I knew what the word shell

4    shocked meant until that letter.  I was so -- I was

5    so surprised, not just by the letter, but I had

6    thought that I was doing so well.  And then they had

7    thought so poorly of me, and I thought I was doing

8    so well.  I thought I was doing so good a job, and

9    that they thought that way of me.  I was so

10   embarrassed.  I was so embarrassed.  I still am

11   embarrassed.

12        Q.  Well, let me ask you this, the contents of

13   the letter said that they felt that your job

14   performance wasn't satisfactory, and they referred

15   to some of these typing problems, correct?  Let me

16   see if I can find it.

17        A.  I can tell you what it says, typographical,

18   structural and grammatical errors, because I sat

19   there and said then they should be writing this to

20   Dr. McIntyre instead of me, because they were his

21   words that I typed, not mine.  Typographical,

22   structure errors on a regular basis on my

23   correspondence.

24        Q.  Those are all things that, as we discussed

79

1    earlier, Tracy had brought to your attention at

2    various times prior to when she handed you this

3    letter; isn't that right?

4        A.   No.   I would say structural errors, no.   She

5    made her changes to things that she thought would be

6    worded better, but I was not lead to believe that I

7    made structural errors at that time.   I was lead to

8    believe that she was changing things to her

9    preference of saying it that way, which was what I

10   assumed Dr. McIntyre had told her she had free rein

11   to do.

12       Q.   But she had certainly criticized your

13   typing, as you told us earlier, hadn't she?

14       A.   No, I would not say she criticized my

15   typing.   I would say a few times there were things

16   brought to my attention that she considered to be

17   errors and I necessarily didn't.   I just said okay,

18   I'll change them.   That's what my job was.   I didn't

19   have a problem with that.   I have a very small ego.

20   I had no problem with that.   Her job was to do that.

21   My job was to type what she told me to, and I did.

22       Q.   In the letter she also said that -- she also

23   raised the issue of your tardiness and unexpected

24   absences; is that right?

1    Q.  Now at some point, this was the process that

2  was followed every --

3    A.  Yes.

4    Q.  -- every day that you worked there; isn't

5  that right?

6    A.  Yes.

7    Q.  Now in this particular day, Friday,

8  August 25th, there was some correction that you

9  found totally inappropriate; is that right?

10    A.  No, not inappropriate.  That's a word that I

11  wouldn't use.  It was -- this was -- I was maybe a

12  little bit more concerned having gotten the letter

13  the week before that what this pile meant to me at

14  one point was now a totally different pile.  It was

15  no longer changes.  It was corrections after this

16  letter that I had received.  What I had been told

17  and lead to believe was my job was to do this, and

18  she would be the second pair of eyes, as I mentioned

19  again, just to see for accuracy and spelling and all

20  of that.  I had no conversations with Dr. McIntyre

21  where he often referenced people that they deal with

22  and children -- children?  God, I'm showing my age

23  there.  And children, students that were applying.

24  So she was in the big loop of all that, and I was

88

1   out of it completely, one hundred percent out of it.

2   So when I got a letter -- if I got that letter from

3   her, I don't know, a week before, I might not have

4   gone to her office.  I might have just typed what

5   she did.  But this one really just -- it was

6   really -- well, you're not asking me about that

7   particular letter.  If you want to, then I won't

8   just go blah, blah, blah.

9       Q.  Well, the letter, as I understand from your

10  answers, you're saying that on the tape that you

11  received from Dr. McIntyre he finished a letter and

12  said something about, "I'll sign this."  Let me

13  look.

14      A.  He wrote a memo to I think they were two

15  family members, two or three.  I don't remember.

16  And it was about a -- so this was in August, and it

17  was about the upcoming football schedule for the

18  following year.  And he gave a list of the games

19  that were, I don't know, open for tickets that he

20  had access to tickets for.  And he asked them to

21  please call my office and let me know.  "If I'm not

22  here, just call the office and leave word and I'll

23  sign off on this."  Now I would say to you that on

24  occasion when he did, I did a lot of personal things

89

1    regarding Ireland and putting a monument for his

2    family whoever there.  I don't care about that.  The

3    only reason I mention that is because sometimes he

4    said that I'll sign off on that meaning instead of

5    writing very truly yours or typing his name and

6    title, he would put very truly yours or whatever

7    he'd put, I don't even remember now, and he would

8    just write -- I don't even know his name, because it

9    was Dr. McIntyre all the time.

10        Q.   James.

11        A.   James McIntyre or Jim, maybe Jim.  So I had

12   done that a number of times with personal memos

13   thinking that -- but this one was different.  It

14   sounded, he had it all -- it actually made sense the

15   way he said it signing off on the tickets.  So that

16   those instructions may have been given to the people

17   he was sending the memo to.

18        Q.   I see what you mean.

19        A.   Instead of just being my instructions to not

20   type, you know, sincerely.

21        Q.   So what did you do?

22        A.   So it wasn't that it was deleted that

23   bothers me.  It was the fact that she put a very

24   large exclamation point on the letter.  And I in

90

1    looking at that --

2        Q.   What had you typed?  That's my question.

3    Did you type, "I'll sign off on this"?

4        A.   There were a number of errors that were on

5    that, that she considered errors, like Mr. -- if I'm

6    not mistaken, Shagle or Shlagle or something is his

7    in-laws.

8        Q.   Do you have a copy of this particular

9    letter?

10       A.   I think I do.  I think I do.  All of this

11   stuff, because it all happened on that day.  I had

12   everything in my desk.  I took everything with me

13   that was mine.

14       Q.   I've never seen it.  If you have a copy I'd

15   like to see it.

16       A.   I have everything that's mine I took off

17   that desk, because he wanted me out of there so

18   fast.

19       Q.   Let me ask you this, calm down.

20       A.   I'll just finish up with that explaining.

21   So the last part of that sentence Tracy had taken

22   the delete sign for the proofreading thing and

23   deleted it.  But not just deleting it but putting a

24   big fat exclamation point, and I'm thinking she's

1    yelling at me by doing that.  This is like saying,

2    you know, it was -- I was being reprimanded for

3    typing that.  So I must have listened to that tape

4    four or five times before I typed it that way and

5    saying is he saying it that way or not.  Because

6    Dr. McIntyre would do what you just did, he'd sit

7    back in a chair.  I'd hear a squeak.  I'd hear an

8    alarm going down College Road with a fire truck

9    going by or something.  It was oftentimes that it

10   was vague, and I wasn't sure.  So I had gone into

11   her office that day, and again not looking for a

12   fight.  I needed that bloody job, excuse my mouth.

13   I needed that job.  I needed my health insurance.  I

14   wasn't going in there looking for a fight from her.

15   I was going in to defend myself.  So anyway, I went

16   into her office --

17        Q.  Do you want to take a couple of minutes?  Do

18   you want to rest?

19        A.  No, I'm fine.  I really am fine.

20        Q.  Before you go -- before we get you into her

21   office, let me ask you this, you have that letter,

22   for instance?

23        A.  Yes, I think I do.

24        Q.  Do you have any other materials that you had

93

1    "Look, I don't think I made these mistakes," and you

2    asked her to listen to the tape, is that what you

3    did?

4        A.   No, I went in there very cautiously going in

5    knowing how she -- she's never been -- took kindly

6    to any opposition to her opinion.  So I was very

7    careful in how to approach her.  That was one of the

8    days that I chose not to -- I mean, I looked at it

9    and went oh, my god to myself.  But I didn't go in

10   with that attitude.  I knew who how to handle her at

11   that point.  I went in and said, "Tracy, I want you

12   to do me a favor, if you don't mind, I'd like to ask

13   you to listen to the tape, because," I said, "I was

14   concerned with my -- the letter you gave me last

15   week and accusing me of making constant errors."

16   And of course if you looked at this pile, it would

17   look like I did make errors with scratch marks all

18   over these things.  "But I want you to listen to the

19   tape.  If you listen to the tape, you'll see why I

20   was confused about whether he meant this or whether

21   he didn't."  She said no.  I said, "Tracy, I really

22   would like you to listen to the tape just because I

23   need your assistance on this one."  I didn't -- I

24   know I didn't say that.  I didn't say I need your

94

1    assistance.  I said, "If you'll listen to the tape,

2    you'll understand why I typed it."  She said, "I

3    will not."  I'll never forget it on my husband's

4    grave, on my mother's grave and my father's grave, I

5    will never forget the way she said it to me.  She

6    said, "I will not."  I was so surprised by that,

7    although I shouldn't have been by that time, but I

8    was surprised by that, because it occurred to me and

9    I wrote that in my interrogatory, she wanted me to

10   be wrong.  She was mad that I was fighting this

11   issue.

12        Q.  Well, she said she would not, and did you

13   ask her again to listen --

14        A.  I asked her again.  I said, "Please do me a

15   favor and just listen to it.  I'm very concerned

16   about this letter that you put in my file accusing

17   me of making mistakes all the time.  And I am just

18   interpreting this exclamation point as a stern

19   warning on something that I made a mistake, and I

20   don't really think I did.  If you just listen to

21   it."

22        Q.  Again she said no?

23        A.  She said, "I will not and I want you to

24   leave."  That's when she asked me to leave.  This

115

1    an envelope, you were a Mrs. Edward Hardiman and not

2    using" -- I mean, I'm Mrs. Lawrence O'Mara, really,

3    technically.  I mean, when my husband was alive.  I

4    never went by that now.  But she said, "That's

5    really ridiculous.  You just don't type them as

6    Mrs. Edward" -- so I had brought that up in this

7    conversation with Dr. McIntyre.  I said, "These are

8    the kind of errors she said I made."  I said, "Do

9    you in fact tell me that -- is there anything wrong

10   about that or is that a judgment call?"  He said,

11   "Well, maybe it's a judgment call."  I was making

12   him uncomfortable by forcing the issue.  I was not

13   going to walk out of there and let him fire me

14   without defending myself.  I said, "What about" -- I

15   gave him two or three other examples.  He said,

16   "Well, they are judgment calls."  The envelopes are

17   the things that he said these are generational

18   differences, the envelopes when it came out.  I

19   said, "Okay, what about the envelopes?"  He said,

20   "Oh, you know, you'll just work better in a better

21   office than this."  I kept thinking they're trying

22   to get me fired and they're trying to say how

23   horrible a worker I am.  Yet they're telling me to

24   go off somewhere else and BC would continue to keep

116

1   me in employment. I thought oh, my god. So he was

2   getting more and more uncomfortable with my just

3   sitting -- I was sitting on the chair facing him,

4   and I just -- he kept saying, "why don't you just

5   get me your keys and I think it's best that you

6   leave." When I said, "Look, I didn't do this." He

7   said, "Look, I think that you're just not a good fit

8   for this place." I said okay, I said, "why?" Then

9   the envelope things, and he said these are

10  generational differences, because he said that all

11  in one call, "They are generational differences and

12  judgment calls, but you're not a good fit." This is

13  how he was trying to justify these things that were

14  said that I was just not a good fit for this office.

15  And I thought okay, I am being -- I've been asked to

16  leave better places than this, and I just realized

17  that I had to just leave. I couldn't believe it. I

18  was so mad because Patrick was on the duck tour that

19  day for his birthday. Patrick's birthday was

20  August 26th, and he was going out on the duck tour

21  with a number of friends of mine. He was going to

22  be celebrating -- they were celebrating his birthday

23  as well as something else, and I didn't take the day

24  to go because of all the problems they were giving

EXHIBIT 2

1      with the reason that we're here today?

2  A.  Well, you want to talk about Dorothy Guinan,

3      yes.

4  Q.  That's correct.  Do you know who Dorothy

5      Guinan is?

6  A.  Yes.

7  Q.  At one point she came to work for you?

8  A.  When she came to work.

9  Q.  Did she come to work for you?

10  A.  Yes.  I believe toward the end of February

11      in the year 2000, a year ago.  It would be

12      two years this coming February.

13  Q.  In what capacity did she work for you?

14  A.  I don't have the formal job definition, but

15      her principal duty was to transcribe my

16      tapes.  But also to answer the phone.  But

17      the primary thing was with the tapes.

18  Q.  And in transcribing the tapes, that's just

19      you would dictate and then she would take

20      that on a dictation machine?

21  A.  Well, basically my schedule is such that I'm

22      just not here a good part of the time.  I'm

23      out on the road, I mean by definition,

24      seeing donors.  I'm representing the

```
 1        Tracey.
 2    Q.  For what reason?
 3    A.  For correction, for editing.  To make them
 4        ready for my signature.
 5    Q.  And so Tracey would edit the letter.  Would
 6        she then give it back to Dorothy Guinan?
 7    A.  I believe -- that's correct.
 8    Q.  And then Dorothy Guinan would type
 9        something, and the final product would then
10        go to you?
11    A.  It would go to Tracey and then to me.  In
12        other words, Tracey would be the filter,
13        that's right.
14    Q.  How long a period of time would a typical
15        letter take?
16    A.  I think it would vary.  I think on the
17        average, I might give a tape on a weekend.
18        And depending upon what else is going on, I
19        might begin to get some of the results on --
20        maybe even some on like Monday or Tuesday or
21        Wednesday.  Sometimes it might take the
22        entire week to get something back.
23    Q.  So it could be anywhere from one to five
24        days?
```

1   A.   Several, sure.

2   Q.   And at some point in time, you felt that

3        Dorothy Guinan was not doing her job at BC,

4        is that correct?

5   A.   I felt -- yes, the bottom line was that she

6        was unsatisfactory.

7   Q.   And when did you first begin to think that?

8   A.   I can't tell you exactly.  But I think

9        almost from the beginning Tracey would give

10       me, you know, regular reports indicating

11       that, Well, this came in this way or this

12       came in that way.  And I think that was

13       fairly early on.

14  Q.   You can't be specific?

15  A.   No, I can't.  But I think again it was early

16       in her tenure.

17  Q.   Do you know how long she worked here?

18  A.   She worked here until the end of August of

19       that year, 2000.

20  Q.   And do you recall what happened just prior

21       to her termination?

22  A.   Well, I saw her.

23  Q.   Before we get there, can you tell me if

24       anything transpired between her and Tracey

```
 1        being very defensive in trying to explain,

 2        you know, why these things had been circled,

 3        that Dorothy really didn't see them as

 4        errors.

 5    Q.  And were you familiar with Dorothy Guinan's

 6        background?

 7    A.  Well, did you want to know more about that

 8        meeting?  Because also at that meeting, I

 9        mean, she allegedly said things like she

10        can't understand why Tracey's in the MBA

11        program, that Dorothy said that she was a

12        better manager than she was.  She thought

13        that it was a joke that Tracey was involved

14        in management.  It was a very insulting,

15        confrontive type meeting.

16    Q.  Can you tell me anything else that happened

17        at that meeting?

18             MR. JOHNSON:  This again is all

19        according to what Tracey told him.

20             THE WITNESS:  Exactly.  That's

21        right.  It's secondhand.  That's right.

22    A.  Not offhand, but there might be other

23        things.  I mean, I just don't recall them

24        offhand.  My impression was it was a very
```

1   A.  Yes.

2   Q.  Were you aware that she had a child of

3       approximately eight years old?

4   A.  Yes.

5   Q.  At that time when she came to work here,

6       were considerations given to the fact that

7       she was a single mother with a seven-,

8       eight-year-old child?

9   A.  Well, I'm inclined to say yes, but I don't

10      know what that means.  I mean, what do you

11      mean, "considerations"?  I mean, we hired

12      her knowing all these things.

13  Q.  Were you aware that she had mentioned that

14      at her early interviews and that she had

15      addressed the problem of she may have

16      difficulty or may at some times be late for

17      work and that was --

18  A.  No.  I have no knowledge or recollection of

19      that.

20  Q.  So after the August 25th meeting with Tracey

21      Lapan and Dorothy Guinan, what happened

22      then?

23  A.  Tracey called me and told me about the

24      meeting.  And again, I just thought it was

EXHIBIT 3

COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

DOROTHY E. GUINAN,                    )
                                      )
        Complainant,                  )
                                      )
vs.                                   )
                                      )          MCAD NO. 01130438
BOSTON COLLEGE, JAMES                 )
McINTYRE, and TRACY LAPAN,            )
                                      )
        Respondents.                  )
_____)

## COMPLAINANT DOROTHY E. GUINAN'S ANSWERS TO INTERROGATORIES PROPOUNDED BY THE RESPONDENT BOSTON COLLEGE

1       With respect to the August 25, 200 meeting between Tracy Lapan and Dorothy Guina,
please set forth fully and completely exactly what took place during this meeting, including how
long the meeting lasted, where the meeting took place, who was present, and exactly what you
said to Ms. Lapan and what Ms. Lapan said to you.

        **A.      I met with Ms. Lapan in her office at the Brock House on the morning of
August 25, 2000, sometime between 10:00-11:00 AM. The meeting was brief, probably not
more than five to ten minutes. She was alone in her office working on her computer when I
entered.**

                **When hired for the position as part-time Secretary, I was instructed that my
typed material was given first to Ms. Lapan for review, and if there were any changes to be
made, it would be returned to me for retyping before going to Dr. McIntyre in final form.
This system made perfect sense to me, since I was not in any way involved with Dr.
McIntyre's day to day activities, other than to type his dictation from a Dictaphone
machine and to answer telephones. Ms. Lapan, on the other hand, met or spoke with Dr.
McIntyre daily.**

                **Because of this, I relied on Ms. Lapan to thoroughly check what I typed since
there were many names of students, applicants for Admission, various faculty and
committee members, donors and members of Dr. McIntyre's family, who were unfamiliar
to me. I understand this was the procedure in place with Ms. Lapan's predecessor. When I
arrived in the office on Friday, August 25, 2000, a stack of Dr. McIntyre's correspondence
typed the previous day was on my desk with Ms. Lapan's changes.**

                **About two weeks prior to this, as I was leaving for the weekend, Ms. Lapan
stopped me to hand me a letter informing me that both she and Dr. McIntyre were
unhappy with my performance. The letter puzzled me, using very non-specific words such**

1

as "lack of focus" and "attention to detail." It was also claimed that my work regularly contained "grammatical, structural and typographical errors," even though my job was to type Dr. McIntyre's words that were dictated by him. I was also criticized for "unexpected absences," further confusing me because I wondered how my absences caused when my son woke-up sick or when someone hit my car at a red light could be considered anything other than unexpected. So I was humiliated and very disturbed to be viewed as an irresponsible and unreliable employee after my productive years in the work force.

When I complained about the letter to Ms. Lapan, she told me that I should not be so defensive and that I said I should take the weekend to calm down. Later the following week, on the morning of August 25, 2000, I began to make Ms. Lapan's changes that had been left for me. I noted one memo with a change that confused me. As I recall, Dr. McIntyre was sending a note to a Mr. And Mrs. Schlegel and Mr. And Mrs. John Sullivan, his family members, about the upcoming football season. He was planning ahead for tickets and after listing the games, asked that they get back to him with their choice of tickets. At the end of the last sentence, Ms. Lapan deleted language that Dr. McIntyre had dictated– "and I'll sign on this." She also added a large, bold exclamation point (!), which to me was a reprimand for typing the memo this way.

So it was with this in mind, that I went to her office that morning with the tape and asked if she would listen to it to clarify what Dr. McIntyre had dictated. She seemed very annoyed that I was interrupting her, so I explained that in light of her recent critical letter to me, it was important for me to show that I did not make a mistake. What Dr. McIntyre dictated would be clear if she would just listen to the tape. Ms. Lapan replied in a very curt manner "I will not." I was very surprised by her reply, that as my supervisor she refused to assist me. I told her that I was very uncomfortable with accusations of regularly making errors and explained that she would see my confusion if she only listened to the tape.

Ms. Lapan became increasingly upset at my persistence, stating once again that she would not listen to the tape (her emphasis), and told me that I should leave her office. Her behavior shocked me and I began to realize there was something going on. I did not understand why I was upsetting her, and, although it was hard to believe, it occurred to me that she in fact wanted me to be wrong.

I was told again to leave Ms. Lapan's office and to close the door on the way out. I was very embarrassed, and as I was closing the door, I asked Ms Lapan if this is the way the Carroll School teaches how to deal with conflict. I was not trying to be snide and meant the question as a serious one. She became infuriated, calling me very unprofessional and told me to leave her office and close the door behind me. In my own defense I replied that I have always been professional and she told me once again to leave.

I left puzzled, embarrassed and disappointed at this encounter, trying to understand what had brought all this on. Ms. Lapan stayed in her office on the telephone with her door closed until I finished my work and left the office at 1:00 PM. This encounter made it clear that for whatever her reasons, Ms. Lapan had no desire to help me and was probably on a course to get rid of me.

2.      With respect to the part of your complaint that alleges you were told Dr. James

McIntyre preferred to have working in his office either a male employee or someone similar to Ms. Lapan rather than you, please state who said this to you, when it was said, where it was said, the context or setting in which it was said to you and what else was said to you in this same conversation in addition to the above.

**A.     Our conversation took place on the second floor of the Brock House. As I recall, the context was a discussion Ms. Lapan and I had concerning my son recently coming down with strep throat. He woke up with a fever of 102 degrees and I needed to drive him to my sister's house in Belmont, Massachusetts to avoid calling in sick. I felt terrible doing this and although I was entitled to ten sick days, Ms. Lapan or Dr. McIntyre did not look kindly on this.**

**I arrived in the office that day probably 10-15 minutes late. I do not recall if it was on this particular day or on another occasion sometime after June 11, 2000 that I also arrived 10 minutes late. My son got out of school for the Summer on June 11, 2000 and before going to work, I drove him to one of several Summer Camps in Brookline, dedham and Wellesley, Massachusetts because our local Roche Community Center Camp did not open until mid July.**

**What I am positive about is that our conversation concerned my tardiness. The pressure on me began in earnest after June 11, 2000, the day on which my son was released from school for the Summer. During the school year, he attended a school ten minutes from the office, so the matter seldom came up. After Patrick was released for the Summer, my starting time switched from 8:30 AM to 9:00 AM since most camps did not start until 9:00 AM.**

**I was told that Dr. McIntyre noted I was late one morning, and Ms. Lapan said that regardless of the reason, he would not make allowances for being late. I was expected to be at my desk at 9:00 AM on the nose, not five or ten minutes late. I was further told there was no bending room about this (regardless of what had been said to me during my interview). When mentioned how often I stay later than necessary on many days, Ms. Lapan said that this did not matter. I also said that on many mornings I was the first person in the office and others arrived later than I did. Ms. Lapan said that whether or not this was true, to Dr. McIntyre "it was a hierarchical thing ." I specifically remember this remark as I had never heard this word used as an adjective before.**

**I was perplexed since I was very straightforward about my situation, explaining that since my husband's death, I was my son's sole certaker and Ms. Lapan assured me that if I needed, the office can work around these matters. I accepted my position based on these assurances and my disappointment was obvious to Ms. Lapan. She attempted to make light of the situation, likening Dr. McIntyre to her Grandfather who can sometimes be cranky. She chuckled at this and it was at this point she revealed to me in her exact words that Dr. McIntyre had really preferred either a clone of her (Ms. Lapan) or a male for my position. I assumed that Dr. McIntyre was speaking to my responsibility as a widow with a young child. Ms. Lapan then said she reminded Dr. McIntyre that "Who else do you think would apply for this job since it is one with mother's hours?"**

**According to Ms. Lapan, Dr. McIntyre remarked on another occasion when facing a matter involving my son, "How come Monica (his wife) had five kids and could handle it**

3

and she (me) cannot handle one?" I was very surprised and shocked by this remark.

3.      In any of your meetings with Tracy Lapan or Dr. McIntyre prior to or on August 25, 2000 did either of them bring to your attention a concern that you were not adding the title "Dr." to James McIntyre's name, that you were incorrectly stating the year's date as 200 rather than 2000, that sentences you had typed lacked punctuation, or contained other typographical errors. If so, please state the dates on which these concerns were told to you, who told you about them amd what response you made about these concerns.

A.      As odd as it sounds, I had only two discussions with Dr. McIntyre in the six months That I worked for him.
        The first occurred after my interview with Tracy Lapan. During this brief meeting, I was a little surprised by his serious demeanor and it seemed to me that he was quite disinterested in being there. He asked a few brief questions, and I felt as though I was taking up his time. To be honest, I was quite surprised to be offered the position, since Dr. McIntyre appeared so unenthused about me at our brief meeting.
        The second and only other conversation we had was the day he called me to his office to fire me. He asked for my keys, and in total shock, when I pressed for an explanation he told me I had been insubordinate to Ms. Lapan (although he relied only on Ms. Lapan's version) and I was not a "good fit" for this position. I was incredulous that the scenario described to him by Ms. Lapan was altered from what actually transpired that day. When I explained this, Dr. McIntyre became agitated, asking if I was calling Ms. Lapan a liar.
        I wanted to make sure he understood the unfair and incorrect criticisms made about me and gave a few examples of things Ms. Lapan referred to as "errors" (afterward vs. afterwards). He really wanted me to leave and finally conceded that yes, perhaps some of my examples could be considered judgment calls or "generational differences."
        About matters brought to my attention by Ms. Lapan, it would be unusual for a day to pass without some comment or "change" made to my work. This is what I was told was the office procedure and I would guess that about 98% of changed material was just that-changed, not corrected. I felt it was Ms. Lapan's prerogative to alter Dr. McIntyre's words to fit her own personal style and preference. I just did my job, what I was told to do, which was to type what I had been given back to retype.
        If Ms. Lapan states that I omitted the title "Dr." or that I typed the year as "200" rather than "2000," I would probably say that I did, although I don't remember a time or exact date. If one checked my Skills Test given to me by Boston College, it would show an error rate of 2% and would confirm that fact that I am not perfect. But because of her management style, this question should probably be asked to Ms. Lapan. I'm confident that every error made by me was noted and filed away to bolster her case against me.
        It became increasingly clear to me that I had been hired to accommodate the workload with the Finance Conference 2000 and both Dr. McIntyre and Ms. Lapan became increasingly unreasonable after its conclusion. Over the six monhts I was at the Brock House, I typed hundreds of letters and memos, so yes, of course, I made a mistake or two. Even Dr. McIntyre told me when he was firing me that "We all make mistakes

4

sometimes." What to me was a back-up plan of a second pair of eyes checking all correspondence became a twisted, distorted picture of my job performance leading to my termination.

For the record, I state unequivocally that nothing I was responsible for left the office with an error. If there were any, they were caught and changed. I'm unsure whether this could be said of others at the Brock House where I'm aware of other, more serious blunders than any made by me. I even have in my file a thank you note given to me for my help in sorting out confusion caused by one such blunder.

4.    Prior to your receipt of a letter dated August 17, 2000 from Tracy Lapan detailing the concerns which she and Dr. McIntyre had about your job performance, had you met in person with Ms. Lapan to discuss these concerns? If so, please state when this meeting took place where it was held and exactly what was said to you by Ms. Lapan and what you said to Ms. Lapan.

A.    Other than the date on which Ms. Lapan gave me the August 19th letter, I do not recall any meetings discussing my performance. I was half expecting one because the position of part-time Secretary was in the category of "Office/Clerical" and there is a probationary period of four months, which in my case was the end of June. Since Ms. Lapan mentioned nothing to me about this, I assumed that no news was good news.

There was a number of discussions and regular criticisms about how and what I should do, but mostly what I should not do. These "discussions" took place regularly as Ms. Lapan returned work to my office for retyping or to give instructions. I would describe this as perhaps what Ms. Lapan may refer to as "meetings." As stated earlier, because I was I hired right at the beginning of the Finance Conference 2000, I was given little or no training as to my office procedures and muddled through the best I could.

When I was hired and had questions, Ms. Lapan was often quite short with me, instructing me to go downstairs and Chris Murphy would help me. She was quite annoyed when I interrupted her and I often wondered as a grad student, if she was working on her own school work. Chris Murphy herself was inundated with the Finance Conference 2000 and did her best to help me in between her own work. If Ms. Lapan needed to locate something and it was not where she wanted it, I was at that time told in a very brash manner what was expected or where something should be kept. This type of regular interaction with Ms. Lapan constituted my training and the learning process for me at 78 College Road.

Ms. Lapan' stern orders involved everything from how many rings were allowed before answering the telephone to where things should be filed. Instructions were also given to help anyone calling or coming to the office. When I attempted to do this and tried to be more pro-active (one of Ms. Lapan's criticisms of me) I was reprimanded. Three incidents that stick out in my mind because I was so shocked by them are listed below:

1.    A student from an Asian country came to the office looking for prescription eyeglasses her mother mailed from home and she thought the package was mailed to 78 College Road. I attempted to search them down, calling the Mail Center, the courier service and then Christine Murphy who had recently transferred to the School of Nursing.

2.    A parent of one of the year 2000 graduates called to inquire about a handicap

5

parking space for a disabled grandparent. I made a number of calls and sent a memo to the responsible office. I then called the student to give him instructions for his follow-up.

      3.     A young man called because during World War II, his father had to leave BC in his senior year, never receiving his degree. The man had always been bothered by this and his son wondered if any special consideration was given to those who did not graduate due to the war.

      In these instances, Ms. Lapan became perturbed that I spent my time dealing with these matters. Instead I should have just informed them their call came to the wrong office. I was told I should always transfer these type of calls back to the operator and when I told her that I did not mind and that I had the time to help, Ms. Lapan told me to "Just dump them!" This may sound unbelievable because it did to me. This statement is the absolute truth and may shed further light into Ms. Lapan's character.

      Although it may appear odd, most of the time I chose not to lock horns with Ms. Lapan over matters I considered to be insignificant and unreasonable, because I was sure in my own abilities. Ms. Lapan was young, still a student in fact. After much thought I came to the conclusion that she will eventually learn, and that it is a really large leap from the academic world to the real world. So Ms. Lapan was certainly never open to my opinion and because of her controlling nature, was often resentful and angry if her opinion was ever questioned. At first I dismissed this as poor luck to be stuck with a very difficult boss with little management experience, but I made the decision early on that for four hours each day, I could handle this. I considered Ms. Lapan a small price to pay and a manageable tradeoff for health insurance for me and my son, Patrick. This job and my benefits were too important to me so I attempted to avoid her as much as possible. I stayed in my office pretty much the entire four hours and went downstairs only to make copies or to do some filing.

      So it was with the aforementioned in mind that I attempted whenever possible to work around Ms. Lapan. Besides her major control issues, as Dr. McIntyre's Assistant, Ms. Lapan was given an enormous amount of power. It amazed me that at such a young age, with her input and evaluation, she greatly influenced Dr. McIntyre's decision to either accept or reject "star file" applicants. She herself once remarked to me that "you probably can't find anyone more anal than me." I was surprised by this comment, but as time went on and her displeasure with me became more intense, I could see why Ms. Lapan held herself in such high regard, given the major power and authority she had been given by Boston College.

5.     Please give the name and address of every employer for whom you have worked since your employment was terminated at Boston College. Please include in your answer the date when you started each job, the date when your employment at each job ended (if it did) and the amount of money you earned at each job.

A.     **I have been working part-time at Buyer Advertising, 189 Wells Avenue, Newton, Massachusetts. The agency primarily deals with recruitment advertising and performs general advertising services for its major clients- Casual Male, MassMutual and Roche Bros. Supermarkets.**

6

Before I was working at BC, I worked there part-time typesetting recruitment ads for the Sunday Boston Globe deadline. I was contacted by them in February of this year after they learned I was no longer at Boston College.

I returned to work there on February 28 of this year. I was complimented on my ability gleaned from ten years experience with the Boston Herald, carefully editing and proofreading my own ads before publication. So it was at this time I was asked to switch from typesetting to proofreading.

My responsibilities now include proofreading ads and correcting errors to ensure quality and accuracy before final publication. I also proofread labels produced for various products sold in its stores under the Roche Bros. Supermarkets brand name.

I also cover the regular proofreader when he is on vacation or takes personal days. I have been asked to work the last two weeks of August as full-time proofreader. For this position I am paid at the rate of $15.00 per hour.

I also interviewed, tested and was offered a job at A.D.S., a transcription service in Harvard Square. Printstaff, a Boston agency staffed by people from the print industry, also gave me a proofreading test and subsequently offered me a position with their firm. In both of these situations, the distance was too far from my home and conflicted with my son's school schedule, so I had to decline both offers. I make mention of these to provide further evidence of the untrue claims placed on my record by Boston College.

6.      If you claim that you have been treated by a physician or other healthcare provider for Medical or emotional problems which you allege you suffered as a result of the termination at Boston College, please give the name and address of each physician or healthcare provider from whom you received treatment, the dates of all such treatment and the type of care or treatment which you have received from each provider.

A.      After I was terminated from Boston College, my life (and as a result, my son's also) was thrown into chaos. This was totally unexpected and I was upset to the point that I wasn't sleeping and lost about ten pounds by the end of September 2000. The start of my son's school year was severely disrupted as he entered the second grade.

I was concerned about my health. On or around October 24, 2000, I contacted my primary care physician, Dr. Roy Welker, a member of Brigham & Women's Primary Physician Group of Francis Street in Boston, Massachusetts. I was not sleeping and had lost about ten pounds, so I received a prescription for Clonazepam, for stress and anxiety. I continue to take these off and on as needed to deal with the emotional stress, financial worries and humiliation this action has caused me. My need for this medication seems to be abating somewhat, that is until it is necessary to once again revisit this most upsetting matter.

It puzzled me greatly as to why this matter distressed me as it did. I note 3 or 4 major life incidents- both of my parents died unexpectedly; my first husband met another woman causing a painful divorce; and, most recently, the death of my second husband and father of my seven-year-old son during an emergency bypass operation 4 years ago, leaving me as a single mother. There were painful moments that tested my coping skills but certainly did not cause the complete meltdown caused by my termination from Boston

College.

I have also had several meetings with Suzanne Piening, a therapist with the Parkway Clinical Associates, Center Street, West Roxbury, Massachusetts to deal with the resulting emotional problems. We met on December 21, 2000 and on January 24th, January 31st, February 7th and February 28th of this year to help me understand the emotions involved in what was done to me at Boston College and the emotional damage being fired can cause, which can resemble grief in many ways.

Lastly, I was advised that exercise would also help in dealing with stress. Because of the stress, my own family history of heart disease and my age, I met with a cardiologist, Dr. Gilbert H. Mudge, at Brigham & Women's Hospital, 75 Francis Street, Boston, Massachusetts on November 28, 2000. I was given a EKG and a stress test was scheduled which I took on December 6, 2000. I had a follow-up appointment with Dr. Mudge again on December 12, 2000 to discuss the test results and to advise me of his recommendations to maintain and guard my future health.

7.    Please state all facts on which you base your allegation that the Respondents Discriminated against you on the basis of age.

A.    I base my allegations on statements made to me and also referred to in Interrogatories #2 and #3 as follows:

- My immediate supervisor, Ms. Tracy Lapan, told me that Dr. McIntyre's preferred choice as part-time Secretary was either a "clone of me (Ms. Lapan) or a male." He was referring to her being a single young woman with no "baggage."

- When I disputed claims of regularly making errors by Ms. Lapan and gave some examples to Dr. McIntyre the day he was firing me, he acknowledged that perhaps "these could be viewed as judgment calls or may just be generational differences."

- When I attempted to get a clearer picture from Dr. McIntyre as to why I was being fired by him, he claimed that I just was not a good fit for this office and would probably work better in a larger office. I wondered if he felt this way why he would suggest that I remain at Boston College at all, in light of the claims he made against me.

- Neither Dr. McIntyre not Tracy Lapan spoke with me at all, unless it was absolutely necessary. They avoided speaking with me while I noted conversations always taking place with the student summer employees. I was made to feel that I was in the way and became increasingly uncomfortable about this. While I was at the Brock House, BC students were hired as well as the High School brother of Ms. Lapan's boyfriend. They were all nice kids and spent a lot of time in Ms. Lapan's office chatting with her on her sofa. This was not surprising to me because they were of similar ages and had common interests.

8

> **Although I understood this, I could not understand daily behavior towards me bordering on rudeness.**

8.      Please state all facts on which you base your allegation that the Respondents discriminated against you on the basis of sex

**A.      I base my allegation on the statement made by Dr. McIntyre and relayed to me by Ms. Lapan that for the part-time Secretary position, "Dr. McIntyre preferred either clone of me (Ms. Lapan) or a male."**

**Ms. Lapan's response to Dr. McIntyre after this statement was made was "Who else do you expect would apply for this position, one with mother's hours?" So in my opinion, this statement could certainly fall into the category of discrimination under any and all of the following- age, sex and parental status.**

**Further credence was given to this statement when he was anxious for Ms. Lapan to interview a male who applied for the position of Administrative Assistant to Dr. McIntyre after Christine Murphy transferred to the School of Nursing. He came in for an interview, but he chose not to pursue the matter.**

**I am unsure of his reasons, but Dr. McIntyre seemed quite uncomfortable around both me and Christine Murphy. We were both probably closer to his age than Ms. Lapan's age, and as noted before, Dr. McIntyre spoke to neither of us.**

**I also base this claim on the fact that in much of the criticism made about me, I was unequivocally singled out as far as being 5-10 minutes late, etc. When I mentioned that others did the same things I was accused of, I was told this was a hierarchical thing.**

SIGNED AND SWORN TO UNDER THE PAINS AND PENALTIES OF PERJURY THIS
_____ DAY OF JULY, 2001.


_____
Dorothy Guinan


As to Objections:


_____
Patrick K. B. Tracy, Esquire
BBO # 567329

9

EXHIBIT 4

```
 1        to.  For instance, Letter on tape to John
 2        Johnson.
 3                  And he would give the tape to me.
 4        And as soon as I had the tape, I would give
 5        it to her as well as any background notes.
 6        For instance, if John Johnson had written
 7        him a letter, he might put a sticky on it
 8        that says, "Letter on tape to John Johnson"
 9        so that you could use that letter for
10        reference with spelling of names, addresses,
11        etc.
12                  MR. JOHNSON:  Off the record.
13                  (Discussion off the record.)
14    Q.  So he would give these things to Dorothy
15        Guinan?
16    A.  He would give them to me and I would give
17        them to her.
18    Q.  And then what would happen?
19    A.  She would type them and she would submit
20        them in draft form to me for corrections.
21        And I would give them back to her to retype
22        what needed to be done.  And she would give
23        them back to me, and I would submit them to
24        Doctor McIntyre for signature.
```

EXHIBIT 5

Christine A. Murphy                                                    April 27, 2006

---

7

1       Q.  And if you know, do you know how
2   old Gretchen was?
3       A.  Probably she's in her 40s.
4       Q.  Okay.  And when did -- Did Gretchen
5   leave Dr. McIntyre's office?
6       A.  She did.
7       Q.  And do you know when that was?
8       A.  She resigned in July of '99.  No.
9   Yes.  Ninety-nine.
10      Q.  Okay.  And --
11          MR. JOHNSON:  Before you --
12  Could you spell that last name again for
13  me?
14          THE WITNESS:  As close as I
15  can get, M-A-C-I-E-J-O-W-S-K-I
16          MR. JOHNSON:  Thank you.
17  Okay.  Sorry.
18          BY MR. TRACY:
19      Q.  And under Gretchen, were you given
20  employment reviews?
21      A.  Yes.
22      Q.  Okay.  Did you receive favorable
23  employment reviews under Gretchen?
24      A.  Always.

---

6

1       Q.  Mm-hmm.
2       A.  And then before that, I worked here
3   in human resources for about 15 years.
4       Q.  Okay.  That's quite a record.
5           Sorry, I have to ask this question,
6   but how old are you now?
7       A.  Fifty-five.
8       Q.  And when did you start in Dr.
9   McIntyre's office?
10      A.  Ninety-one.
11      Q.  Okay.  And when you were at Dr.
12  McIntyre's office, did you work under a
13  woman named Gretchen?
14      A.  Yes.
15      Q.  What was Gretchen's full name?
16      A.  Gretchen Geller was her maiden
17  name, and her married -- she was married
18  while I was working for her -- was
19  Maciejowski, M-A-C-I-E-J-O-W-S-K-I.
20      Q.  That was pretty good.
21      A.  Maciejowski.
22          MR. JOHNSON:  You should be
23  in the spelling bee.
24          BY MR. TRACY:

---



**Jack Daniel**
Court Reporting & Video Services Inc

Technologies you can use • Experience you can Trust

Direct Dial:        617.557.0039
Toll Free:          866.814.0039
Toll Free Fax:      866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts  02114

Christine A. Murphy                                    April 27, 2006

10

1    Q.  And do you remember when she took
2    over?
3    A.  I believe it was October of '99.
4    Q.  Okay.  And then did things start to
5    change in the office at that time?
6    A.  Yeah.  Anytime somebody new comes
7    in, things -- things change.
8    Q.  Did the stress ratio start to rise
9    when she was there?
10        MR. JOHNSON:  Objection.
11        You answer, if you're able.
12        BY MR. TRACY:
13   Q.  Do you know what I mean?  Do you
14   want me to rephrase that?
15   A.  Maybe you could say it a different
16   way, yeah.
17   Q.  Okay.  Did you feel more stress
18   while working under Tracy Lapan than
19   under, say, Gretchen?
20   A.  Yes.  Under Gretchen, yes.  There
21   was way less stress under Gretchen, if
22   that's what you're asking.
23   Q.  And what was the Read Aloud
24   program?



**Jack Daniel**
Court Reporting & Video Services
Inc.

Technologies you can use  •  Experience you can Trust

Direct Dial:    617 557 0039
Toll Free:      866 814 0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Christine A. Murphy                                      April 27, 2006

18

```
 1        campus positions probably in the late fall
 2        of 1999, and more intensely focusing on it
 3        in March of 2000.
 4          Q   When you say intensely and kind of
 5        laughed a little bit, what do you mean?
 6          A   After my performance evaluation --
 7          Q   Mm-hmm.
 8          A   -- in March, I came to see Bernie
 9        O'Kane, and I told him I -- I need to
10        move more quickly on this.
11          Q   Okay. Because you had -- you've
12        had it with that office; is that right?
13          A   Right
14          Q   Okay. Your evaluation under Tracy
15        Lapan, was that a good evaluation?
16          A   Not in my opinion, no.
17          Q   Can you tell me a little bit about
18        it?
19          A   It was -- The ratings were very low
20        compared to anything I had gotten in
21        previous years of employment, and she had
22        criticized my inability to do certain
23        tasks that she felt I should at that stage
24        be doing.
```



Jack Daniel
Court Reporting & Video Services Inc.

Technologies you can use • Experience you can Trust

Direct Dial:      617 557 0039
Toll Free:        866 814 0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

28

1      BY MR. TRACY:
2      Q.  You can answer.
3      A.  Okay.  Yes.  I just felt more
4  comfortable speaking to Bernie O'Kane.  I
5  knew Bernie personally anyway.
6      Q.  And Bernie and this guy, Pepperill
7  -- Is that his name?
8      A.  Pimentil.
9      Q.  Pimentil.  They helped you?
10     A.  Yes.  Bernie referred me to Mike
11  Pimentil.
12     Q.  Okay.  And then after you got a
13  negative review by Tracy Lapan, you told
14  him, "Hey, I need this sooner than later."
15  Is that correct, basically?
16     A.  Yes.
17     Q.  Okay.  And how -- And when did you
18  transfer out of Dr. McIntyre's office?
19     A.  In July of 1999.
20         MR. JOHNSON:  Just to
21  correct, I think it was July 2000.
22         THE WITNESS:  I'm sorry.
23  Yes.  I keep saying '99.  Yes.  Thank
24  you.



Jack Daniel
Court Reporting & Video Services Inc.
Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Christine A. Murphy                                      April 27, 2006

29

1      A. It was 2000.
2      Q. How many good evaluations have you
3   received since you shifted or changed
4   offices?
5      A. Well, if you mean good meaning
6   positive from School of Nursing --
7      Q. Yeah. Positive. What do you
8   believe --
9      A. Yes. All -- all -- all of them.
10     Q. -- you know, since then
11     A. All my evaluations, yes.
12     Q. Okay. And do you know how long it
13   took for your job to be -- for someone to
14   replace the job that you left in Dr.
15   McIntyre's office? Do you know how long
16   it took?
17     A. I'm going to say three months.
18     Q. Okay.
19     A. The best of my knowledge.
20     Q. Do you know who this person was?
21     A. Yes.
22     Q. Who was that?
23     A. Carrie Alden.
24     Q. Okay. And how old is she?

30

1      A. She's about my age.
2      Q. Okay.
3      A. Alden, A-L-D-E-N.
4      Q. And getting back to talking to
5   Bernie O'Kane, you were stressed at that
6   point in time. You wanted out of there;
7   is that right?
8          MR. JOHNSON: Objection.
9      You go ahead.
10     A. I think I answered that.
11     Q. Yeah. You did answer the question,
12   but let me -- let me ask it --
13         MR. JOHNSON: Well, you got
14   the answer.
15         BY MR. TRACY:
16     Q. Did you keep touch with anyone in
17   Dr. McIntyre's office after you left?
18     A. Carrie called me several times with
19   questions --
20     Q. Mm-hmm.
21     A. -- about the job, which I helped
22   her with. She eventually called me when
23   she began to have some difficulties, and I
24   tried to be supportive for her.


Jack Daniel
Court Reporting & Video Services
Inc
Technologies you can use • Experience you can Trust

Direct Dial:        617.557.0039
Toll Free:          866.814.0039
Toll Free Fax:      866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Christine A. Murphy                              April 27, 2006

```
                         41
 1        A.  Yeah
 2        Q.  -- the way were you treated in Dr.
 3   McIntyre's office?
 4        A.  That's right.
 5        Q.  Okay.  And Tracy Lapan was in that
 6   office at that time, correct?
 7        A.  Yes.
 8        Q.  And you transferred out of that
 9   office?
10        A.  Yes.
11        Q.  And you feel better after you did
12   that?
13        A.  I work for wonderful people right
14   now, yes.
15        Q.  And you liked the job before Tracy
16   Lapan got there as well?
17        A.  I liked the job when I had Gretchen
18   as my supervisor.  I went through a very
19   difficult time in the -- in the months
20   after Gretchen left.
21        Q.  When it was just Dr. McIntyre.  And
22   then when Tracy Lapan was your supervisor,
23   you didn't like the job, correct?
24        A.  Well, the other thing was she
```



**Jack Daniel**

Court Reporting & Video Services Inc.

Technologies you can use • Experience you can Trust

Direct Dial:        617 557 0039
Toll Free:          866 814 0039
Toll Free Fax:      866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114